1

2   JED RUBENFELD
    NY Bar # 2214104
3   1031 Forest Rd.
    New Haven, CT 06515
4   Telephone: (203) 432-7631
    E-mail: jed.rubenfeld@yale.edu
5
6   Attorney for Plaintiffs American Values 2024 and Jessica Reed Kraus

7   ROGER I. TEICH
    California State Bar No. 147076
8   337 Liberty Street
    San Francisco, CA 94114
9   Telephone: (415) 948-0045
    E-mail: rteich@juno.com
10
    Attorney for Plaintiff American Values 2024
11
12  RICHARD JAFFE, ESQ.
    California State Bar No. 289362
13  428 J Street, 4th Floor
    Sacramento, California 95814
14  Tel: (916) 492-6038
    E-mail: rickjaffeesquire@gmail.com
15
    Attorney for Plaintiffs Robert F. Kennedy, Jr. and Jessica Reed Kraus
16
                    **UNITED STATES DISTRICT COURT**
17              **NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN FRANCISCO DIVISION**
18

19  ROBERT F. KENNEDY, JR.,
    AMERICAN VALUES 2024, and
20  JESSICA REED KRAUS,
                             *Plaintiffs*,          **Case Number:**  3:24-cv-02869
21  -v.-
                                                    **VERIFIED AMENDED COMPLAINT**
22  META PLATFORMS, INC., FACEBOOK
    OPERATIONS, LLC, INSTAGRAM, LLC,                **Jury Trial Demanded**
23  MARK ZUCKERBERG, and JOHN DOES 1-10,
                             *Defendants*.
24

25
                         Page 1 of 35
26

As and for their Verified First Amended Complaint herein, Plaintiffs state and allege as follows:

## INTRODUCTION

1.      This is an election interference case.

2.      In violation of the Voting Rights Act, of civil rights laws dating back to the Civil War, of the First Amendment, and of the American people's fundamental right to a presidential election decided by voters, not by corporations, the social media giants Meta Platforms, Facebook, and Instagram are brazenly censoring speech by and supportive of Independent presidential candidate Robert F. Kennedy, Jr., while lying to the public about it.

3.      In public, Meta declares: "We don't want to get in the way of open, public and democratic debate on Meta's platform—especially in the context of elections in democratic societies like the United States. The public should be able to hear what their politicians are saying . . . so that they can make informed choices at the ballot box."

4.      But behind closed doors, Meta and its platforms are implementing a radically different agenda, preventing hundreds of millions of people from seeing, posting, or receiving speech supporting Mr. Kennedy's candidacy—and threatening users who attempt to do so.

5.      Plaintiffs Kennedy and American Values 2024 ("AV24") originally filed this action on May 13, 2024, after Defendants prevented users from seeing or posting a film called *Who Is Bobby Kennedy*, while at the same time spinning a web of fantastic falsehoods about that film, for example telling users it contained "sexual" or "violent" or gun-related content.

6.      It was Plaintiffs' hope that filing the complaint in this case would put Defendants on notice of the illegality of their brazen censorship of protected speech in the middle of a presidential election and persuade them to bring a halt to that censorship.

1

2    7.      Instead, it has intensified radically.

3    8.      Defendants are now preventing users from simply expressing support for Mr. Kennedy or

4    encouraging others to vote for him. For example, Defendants have blocked the following posts

5    on Meta's behemoth social-media platforms Facebook and Instagram:

6            •       "Kennedy all the way!"

7            •       "VOTE KENNEDY"

8            •       "Time to add Kennedy to the mix"

9            •       "#letbobbydebate"

10   9.      There can be no possible claim that comments like these violate any Meta terms of

11   service.

12   10.     In other words, Defendants are preventing citizens from engaging in lawful support and

13   advocacy for a presidential candidate.

14   11.     And Defendants are not merely blocking such pro-Kennedy support and advocacy; they

15   are threatening, suspending, and intimidating users who engage in it.

16   12.     At the same time, Defendants are now removing and suppressing[1] links concerning

17   Kennedy campaign events.

18   13.     One major such event was the online "Real Debate," in which Mr. Kennedy answered on

19   camera (in real time) the same questions put to Donald Trump and Joe Biden at CNN's

20   presidential debate on June 27, 2024. On X (formerly known as Twitter), five million people

21   watched the Real Debate, but on Meta's platforms, users were blocked from posting links to it,

22

23

24   [1] Meta uses a variety of devices and strategies to secretly demote, hide, and/or limit the visibility
     and reach of disfavored content (practices known as "shadow-banning," "demoting," "sand-
25   boxing," or "de-boosting").

26

prevented from marking "Going" or "Interested" (as they would ordinarily be able to do) on "The Real Debate Watch Party" pages, and prevented from posting content containing Mr. Kennedy's closing remarks.

14.     In addition, Defendants are removing posts that share a link—and threatening users with suspensions if they continue sharing a link—to www.kennedydebunked.com, a website offering refutations of false statements made about Mr. Kennedy.

15.     Defendants are even obstructing Plaintiffs from gathering evidence for this case, blocking links to www.kennedycensored.com, a website (off the Defendants' platforms) that invites visitors to report examples of pro-Kennedy comments and posts that Defendants and other social-media platforms have censored.

16.     This increasingly broad and brazen censorship of support for Mr. Kennedy is occurring just a few months before the presidential election and at a time of historically uncharted volatility in a United States presidential race.

17.      Only days ago, the presumptive Democratic presidential nominee withdrew from the campaign.

18.     As of the date of filing, it is not known who will replace him.

19.     Every additional day that Defendants continue to suppress support and advocacy for Mr. Kennedy in the modern public square causes grave, irreparable harm.

20.     Every additional day that Defendants continue to suppress support and advocacy for Mr. Kennedy deprives Mr. Kennedy of an opportunity to present his views to the American people, and deprives American voters of their right to speak freely about the most important in our democracy—the election of the President.

21.     Because Defendants are deliberately inflicting injury on users who express support and advocacy for Mr. Kennedy, and because they are by threat, intimidation and force preventing users from engaging in such support or advocacy, they are violating the Support or Advocacy Clauses of the Civil Rights Act of 1871 (codified in Section 1985(3)) and Section 11(b) of the Voting Rights Act. Because their censorship is the result of collusion with the Federal Government, they are violating the First Amendment as well.

22.     The irreparable harm Defendants are causing is so great and so immediate that it leaves Plaintiffs no choice: today, Plaintiffs hereby submit this First Amended Complaint to describe Defendants' ongoing, intensified censorship campaign, and by separate motion Plaintiffs seek immediate injunctive relief.

## ALLEGATIONS COMMON TO ALL COUNTS

*23.*     On May 3, 2024, Plaintiff American Values 2024 ("AV24"), a political action committee supporting Mr. Kennedy, released online a thirty-minute documentary film called *Who Is Bobby Kennedy?*[2]

24.     The film offers a simple, honest look at Mr. Kennedy's life, formative experiences, accomplishments, character, and values, especially his belief in America and her founding principles, inviting voters to make up their own minds about Mr. Kennedy, rather than accepting falsehoods about him repeatedly asserted by major news outlets and social media platforms.

25.     The film is the property of AV24, which paid approximately one million dollars to cover production costs.

---

[2] The film can be viewed at www.whoisbobbykennedy.com.

26. It was written, produced, and directed by acclaimed screenwriter Jay Carson and director and photographer Mike Piscitelli, and it is narrated by award-winning actor Woody Harrelson.

27. Clips of past interviews with Mr. Kennedy are featured prominently in *Who Is Bobby Kennedy*, so that his speech and advocacy are central to the film.

28. At 4:24 pm on May 3, AV24 uploaded to its Facebook page a short "teaser" or trailer for *Who Is Bobby Kennedy*.

29. At 4:38 pm, AV24 posted a full-length version of the film on a dedicated website, whoisbobbykennedy.com.

30. Defendants quickly began censoring the film.

31. As early as 4:45 pm, Facebook was blocking and removing the teaser or trailer when users tried to post it on their own pages.

32. On Facebook and Instagram, users who attempted to watch the film were prevented from doing so.

33. On Facebook and Instagram, users who attempted to share the film were prevented from doing so.

34. On Facebook and Instagram, users who attempted simply to post links to the film or to the dedicated website were prevented from doing so.

35. On Facebook and Instagram, users who attempted to watch, share, or post a link to the film were not only prevented from doing so; they were threatened with suspension of their

1

2  accounts and/or other punitive action if they persisted in such activity and were warned that

3  "repeatedly breaking our rules can cause accounts more restrictions."[3]

4  36.    Defendants made good on these threats, penalizing users for multiple (blocked) attempts

5  to share the link, including having restrictions imposed on their Facebook and/or Instagram

6  accounts, and including in some cases account suspensions.

7  37.    Users received messages giving a wide variety of explanations of Facebook's and

8  Instagram's actions, including assertions that *Who Is Bobby Kennedy* violated Facebook's

9  "community standards," that it was "spam," that it "praise[d] organized crime or hate groups,"

10  that it "solicit[ed] sexual services," that it contained "sexual activity," or "violent or graphic

11  content," that it offered the "sale of firearms or drugs," or that it "may be malicious."

12  38.    All these suggestions were and are absurd.

13  39.    *Who Is Bobby Kennedy* contains no "sexual activity," no "violent or graphic content," no

14  "praise" of "organized crime or hate groups," no "solicitation" or "sexual services," and no

15  offers for the "sale of firearms or drugs."

16  40.    On some users' pages, when they tried to watch *Who Is Bobby Kennedy?*, a still shot

17  from the film was displayed, and along with a message saying that the film was "blocked," a

18  COVID overlay was inserted into the still shot saying "COVID-19 vaccine" and directing users

19  to get information from other recommended sources, such as the federal Centers for Disease

20  Control and Prevention ("CDC"), an agency that has been integral to the Administration's online

21  censorship campaign directed at COVID- and vaccine-related content. *See, e.g.*, *Missouri v.*

22

23

24  [3] The Kennedy campaign has received hundreds of screenshots from third-party users showing
    the threats, intimidation and sanctions the users themselves received from Meta for attempting to
25  watch, post or link to the film.

26

1

2      *Biden*, 83 F.4th at 361-62 ("CDC officials also provided direct guidance to the platforms on the

3      application of the platforms' internal policies and moderation activities."); *Missouri v. Biden*,

4      2023 U.S. Dist. LEXIS 114585, at *51 ("Federal officials informed Facebook that the federal

5      health authority that could dictate what content could be censored as misinformation was the

6      CDC.").

7      41.    There is nothing about COVID that could conceivably be called misinformation in *Who*

8      *Is Bobby Kennedy* (indeed there are virtually no references to COVID at all), and the film

9      contains nothing else that comes remotely close to a violation of any social media platform's

10     "community standards."

11     42.    Defendants' censorship of *Who Is Bobby Kennedy* has prevented the film from reaching

12     tens of millions of Facebook and Instagram users, and millions more people with whom those

13     Facebook and Instagram users would have shared the film.

14     43.    In the early morning of May 5, 2024, after receiving considerable negative press, Meta

15     claimed in a statement to the New York Times that its censorship of *Who Is Bobby Kennedy* was

16     the result of a "mistaken" determination that the film was "spam," that the "mistake" had been

17     corrected, and that the film was no longer being censored.

18     44.    These claims too were false.

19     45.    To begin with, Defendants did ***not*** stop censoring *Who Is Bobby Kennedy*; they continued

20     to censor it after May 5, and they are still doing so even now.

21     46.    Both before and after May 5, Facebook and Instagram users were hit with account

22     suspensions for trying to share or link to *Who Is Bobby Kennedy*.

23     47.    To give just one of innumerable examples, on May 7, a Kennedy supporter located in

24     California sought to post a link to *Who Is Bobby Kennedy* on both Instagram and Facebook, but

25

26                                            Page 8 of 35

was blocked from doing so. When he continued trying to share the film with others through his Facebook page, he received a message from Facebook stating that his account had been placed under a 24-hour suspension during which he would not be able to post any further content on it.

48.     Even now, Meta is continuing to "shadow-ban" and "de-boost" the film, for example by preventing links to the film from appearing on users' timelines or feeds, techniques through which Meta deliberately, substantially but surreptitiously reduces the reach and dissemination of content.

49.     At the same time, Meta has continued to send messages to users falsely stating that the film is "spam" or contains "sexual" or "violent" content.

50.     The notion that *Who Is Bobby Kennedy* was being accidentally censored because it was mistaken for "spam" is highly implausible on its face.

51.     Spam refers to in-bulk dissemination of messages, especially commercial messages, to large numbers of recipients, whereas Defendants were censoring individual users from merely posting a link on their own pages to a website displaying a political film. Moreover, the "mistaken as spam" claim is further contradicted by (a) the numerous messages users received from Meta offering other, equally bogus explanations; and (b) the fact that Defendants are brazenly censoring messages merely expressing support for Mr. Kennedy, demonstrating that Defendants are systematically targeting pro-Kennedy content.

52.     By comparison to the viral impact of *Who Is Bobby Kennedy* on X, where the film's original posting has now been viewed one hundred million times, the film's reach on Instagram and Facebook has been minimal, demonstrating the immensely powerful suppressive effect of Defendants' censorship and threats.

53.     The popularity of *Who Is Bobby Kennedy* on X does not negate Meta's censorship of the film; on the contrary, it confirms that Defendants' censorship prevented tens of millions of Facebook and Instagram users from seeing the film and demonstrates the scope of the injuries that Meta's censorship is causing.

54.     Facebook is the dominant social media platform for Americans aged 58 and over, who include the "Baby Boomer" generation.

55.     An estimated 60-70% of this demographic use Facebook, as compared to only some 10% who use X.

56.     Americans aged 58 and over are a critical voting and donating demographic.

57.     Accordingly, regardless of the film's availability and popularity on X, Meta's suppression of *Who Is Bobby Kennedy* has caused and is causing:

      A.     substantial donation losses to Mr. Kennedy and AV24;

      B.     substantial injury to Mr. Kennedy's candidacy;

      C.     substantial injury to Mr. Kennedy's and AV24's free speech rights; and

      D.     substantial injury to AV24's property rights; and

      E.     substantial injury to the rights of citizens and voters who sought to express their support for Mr. Kennedy's candidacy, and/or urge others to vote for him, by sharing the film.

58.     In addition to their censorship of *Who Is Bobby Kennedy*, Defendants are censoring pro-Kennedy speech entirely unrelated to the film.

59.     For example, on May 8, a user tried to post the following statement to her Facebook page: "RFKjr needs 180,000 signatures to get on the ballot in #Texas and time is running out. Go to kennedy24.com/events and find a petition signing event near you." She received the following

message: "We removed your comment." And she was warned that "[r]epeatedly breaking our rules can cause more account restrictions."

60.    Since the original filing of this suit on May 13, 2024, Defendants' censorship of pro-Kennedy speech has radically intensified.

61.    In the past 60 days, the Kennedy campaign has received reports from over 200 individual Facebook and/or Instagram users who have been prevented from sharing links to www.kennedy24.com, censored for posting pro-Kennedy content, threatened by Meta with account suspensions or terminations for posting such content, and/or have suffered suspensions or terminations on account of such advocacy.

62.    The pro-Kennedy content being censored on Facebook and Instagram can by no stretch of the imagination be said to violate any Meta terms of service or "community standards."

63.    On the contrary, the content now being blocked includes the simplest possible expressions of support for Mr. Kennedy, such as "Kennedy all the way!" "VOTE KENNEDY," "Time to add Kennedy to the mix," or "checkout Kennedy's policy page on his website."

64.    Further examples of Defendants' censorship of content that cannot remotely be said to have violated any Meta "community standards" are as follows:

    A.    Facebook and Instagram users were prevented from sharing links to "The Real Debate" (an online debate event described *supra*);

    B.    Facebook and Instagram users were prevented from sharing links to a petition for the inclusion of Kennedy in the presidential debates;

    C.    Facebook and Instagram users were prevented from posting the hashtags #letbobbydebate and #boycottCNN; and

D.      Facebook and Instagram users were prevented from sharing links to news coverage of a RFK, Jr. Debate Rally in Miami, Florida.

65.     In every such case, Defendants also sent threats to such users warning them that attempts to repost the censored content would result in account restrictions, suspensions, and/or terminations.

66.     Meta even made private messages between users with links to "RFK, Jr." unavailable on Instagram.

67.     Defendants are also removing posts that share a link—and threatening users with suspensions if they continue sharing a link—to www.kennedydebunked.com, a website offering refutations of false statements made about Mr. Kennedy.

68.     Almost comically, Meta is also deploying its AI Chatbot to deflect simple queries about whether Mr. Kennedy is running for President with bogus responses such as "Robert F Kennedy, Jr. has not announced his candidacy for president" and "As for the current political landscape, there are no Kennedys currently running for president in the 2024 elections."

69.     Finally, adding obstruction to injury, Defendants are now blocking links to a dedicated off-platform website, www.kennedycensored.com, where social media users are invited to report and submit evidence of their own experience of being censored for posting pro-Kennedy content.

70.     A vivid illustration of the intimidating censorship of pro-Kennedy content faced by users of Defendants' platforms is provided by Plaintiff Jessica Reed Kraus, an independent journalist with over 330,000 paid subscribers to her Substack blog, "@HouseInhabit" and an Instagram following of 1.2 million.

71.     Ms. Reed Kraus covers politics and popular culture, with "behind-the-scenes" insights, and monetizes her work by posting free content on Instagram that in turn draws subscribers to her paid Substack account.

72.     Since October 2023, she has invested significant time and resources following both former President Trump and Mr. Kennedy on the campaign trail.  Her Instagram account has been widely censored and demoted for her coverage of Mr. Kennedy, but not for her coverage of President Trump.

73.     Last October, Ms. Reed Kraus wrote supportively on Instagram about Mr. Kennedy's "divorce" from the Democrats, and her account lost 40,000 followers overnight.

74.     There is no explanation for this unprecedented phenomenon other than a surreptitious "demoting" or "de-boosting" of her Instagram account by Defendants due to her supportive remarks about Mr. Kennedy.

75.     In November, 2023, after a month of covering Kennedy regularly in her daily Instagram feed, her story views plummeted—again, an unprecedented event explainable only by the fact that Defendants were "shadow-banning" (i.e., reducing the dissemination of) her content due to her pro-Kennedy content.

76.     Her posts supporting Mr. Kennedy were constantly flagged with "COVID-19 misinformation" warnings, despite containing no such misinformation.

77.     Moreover, her account was restricted from being shown to non-followers—a critically damaging restriction, because it prevented her from recruiting new subscribers to her paid Substack.

78.     In May 2024, Ms. Reed Kraus was given an exclusive to launch *Who is Bobby Kennedy* online.

79.     On May 3, Ms. Reed Kraus posted excerpts of the film on Instagram.  These excerpts were intended to encourage and urge people to vote for Mr. Kennedy.

80.     Within minutes of posting those excerpts, she was locked out of her Instagram account, and her account was again disabled from being shared with new followers or being recommended-to-follow.

81.     At the same time, she received warnings that further such conduct on her part would result in graver punitive measures.

82.     Due to Defendants' restrictions and shadow-banning, her Instagram Story views shrank from 200,000 to 60,000 per day.

83.     Since May 3, she has tried to post other comments supportive of Mr. Kennedy's campaign, but has been met with similar threats and restrictions.

84.     Before the June 27 debate, she posted to Instagram a poll in which 90% of the 300,000 people who responded said that Kennedy should be allowed to debate. Within minutes, Instagram blocked this post as "inappropriate" because it "violates our community standards" and warned Ms. Reed Kraus that further such posts would cause account restriction or termination.

85.     As a result of Defendants' actions, Ms. Reed Kraus has been put in fear of posting additional content online supporting or advocating for Mr. Kennedy or urging others to vote for him, and Ms. Reed Kraus, because of this apprehension, has desisted from doing so.

86.     Moreover, Defendants' restrictions have prevented new followers from seeing her posts, eliminating potential new subscribers to her Substack and thereby causing substantial monetary loss.

**PARTIES**

87.     Plaintiff Robert F. Kennedy, Jr. is an award-winning lawyer, author, American citizen, and current candidate for President of the United States.

88.     Plaintiff American Values 2024 (AV24) is a super PAC committed to educating and mobilizing voters to elect candidates who will restore and protect the soul of democracy in the United States. Currently, AV24 supports Mr. Kennedy's presidential campaign.

89.     Plaintiff Jessica Reed Kraus is an independent journalist, a resident of California, and an American citizen eligible to vote.  Ms. Reed Kraus covers politics and popular culture, with "behind-the-scenes" insights, and monetizes her work by posting free content on Instagram that in turn draws subscribers to her paid Substack account.

90.     Defendant Meta Platforms, Inc. is a trillion-dollar social media corporation headquartered at 1 Hacker Way in Menlo Park, California.

91.     Defendant Facebook Operations, LLC is and/or operates the vastly popular social media platform known as Facebook, and is headquartered in California.

92.     Defendant Instagram, LLC, is and/or operates the popular social media platform known as Instagram, and is headquartered in California.

93.     Defendant Mark Zuckerberg is Meta's CEO and controlling shareholder and a resident of California.

94.     Defendants John Doe 1-10 are officers and employees of Meta, Facebook, and/or Instagram, whose identities are unknown to Plaintiffs, who knowingly participated in, agreed to implement, or knowingly neglected or refused to prevent the censorship of *Who Is Bobby Kennedy*, despite having power to prevent or aid in preventing the commission of the same.

1

2

**JURISDICTION, VENUE, AND DIVISION**

3   95.    The Court has jurisdiction under the Constitution, 28 U.S.C. § 1331, and 42 U.S.C.

4   §§ 1985, 1986, as this case arises out of Defendants' violation of the First Amendment and of the

5   Civil Rights Act of 1871 as alleged herein.

6   96.    Venue is proper because of Meta forum-selection clauses, because all Defendants reside

7   in this state and at least one Defendant resides in this district, because the events in question

8   substantially took place here, and/or because several of the Defendants are subject to personal

9   jurisdiction here. 28 U.S.C. § 1391(b)(1)-(3).

10   97.    This case should be assigned to the San Francisco Division based on the Defendants'

11   location in this Division, and because many of the wrongdoings arose in this Division.

12

13   **COUNT ONE:**
**VIOLATION OF SECTION 11(b) OF THE VOTING RIGHTS ACT**

14   98.    Section 11(b) of the Voting Rights Act of 1965 forbids any person, "whether acting under

15   color of law or otherwise," to "intimidate, threaten, or coerce any person . . . for urging . . . any

16   person to vote." 52 U.S.C. § 10307(b).

17   99.    Section 11(b) creates a private right of action. *See, e.g.*, *Krabach v. King Cnty*, No. 2:22-

18   cv-1252-BJR, 2023 U.S. Dist. LEXIS 191870, at *7-8 (W.D. Wash. Oct. 25, 2023).

19   100.   "Section 11(b) 'is to be given an expansive meaning.'" Statement of Interest of the

20   United States of America, Aug. 12, 2022, ECF 235 in *National Coalition on Black Civic*

21   *Participation v. Wohl*¸ No. 1:20-cv-08668-VM-OTW (S.D.N.Y.) (quoting *Jackson v. Riddell*,

22   476 F. Supp. 849, 859 (S.D. Miss. 1979)).

23   101.   By its express terms, Section 11(b) does not require state action, but can be violated by

24   private parties not "acting under color of law." 52 U.S.C. § 10307(b).

25

26

Page 16 of 35

102.     The words "intimidate, threaten, or coerce" in Section 11(b) are not limited to physical threats or violence. They also encompass more subtle forms of pressure, including economic harm and threats to deprive a person of anything of value, as well as false statements intended to prevent or dissuade people from engaging in protected voting-related activity. *See, e.g.*, *United States v. Mackey*, No. 21-CR-80 (AMD)**,** 2023 U.S. Dist. LEXIS 186646, at *65-66 (E.D.N.Y. Oct. 17, 2023) (upholding conviction for disseminating false information online intended to trick people into not voting, and holding that the words "injure, oppress, threaten, or intimidate" in 18 U.S.C. § 241 encompass not only "violence," but also **"*false utterances*"**) (emphasis added).

103.     Section 11(b) does not protect only the act of voting itself, but also, by its plain language, the act of "urging" people to vote, 52 U.S.C. § 10307(b), which in turn includes "encourag[ing] others . . . to vote," H.R. Rep. No. 89-439, at 30 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2462, for a particular candidate..

104.     In disseminating *Who Is Bobby Kennedy*, AV24 was advocating for Mr. Kennedy, trying to persuade viewers to consider his candidacy, and urging and encouraging people to vote for him, as were countless censored Facebook and Instagram users (including Plaintiff Reed Kraus) who tried to share the film.

105.     Similarly, Ms. Reed Kraus was urging and encouraging people to vote for Mr. Kennedy when she posted the pro-Kennedy content that led to her suspensions by Defendants, and so were the many other users who posted the censored expressions of pro-Kennedy support described above.

106.     Defendants' censorship of those posts and of *Who Is Bobby Kennedy* was in violation of their Terms of Service, in breach of their contracts with their users, and unlawful.

107.     Unlawfully censoring such speech forced and coerced users not to urge persons to vote for Mr. Kennedy.

108.     Unlawfully restricting and threatening to restrict the accounts of people who engaged in such speech threatened and intimidated people for urging others to vote by (a) inflicting or threatening to inflict economic harm on them; (b) injuring or threatening to injure them in their property and contract rights; (c) cutting them off or threatening to cut them off from participation in the modern public square; and (d) in other respects depriving or threatening to deprive them of things of value.

109.     Thus through the actions described above, Defendants committed and are committing innumerable violations of Section 11(b) of the Voting Rights Act.

**COUNT TWO:**
**CONSPIRACY TO INJURE ON ACCOUNT OF SUPPORT**
**AND ADVOCACY IN VIOLATION OF 42 U.S.C. § 1985(3)**

110.     All foregoing allegations are repeated and realleged.

111.     The Support or Advocacy Clauses of Section 1985, originally enacted as part of the Ku Klux Klan Act of 1871, prohibit conspiracies "to injure any citizen in person or property on account of" such citizen's "giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President." 42 U.S.C. § 1985(3).

112.     Unlike the "equal protection" or "equal privileges" clauses of Section 1985(3), the Support or Advocacy Clauses are not limited to class-based discrimination and do not require state action or the involvement of government officials. *See, e.g.*, *Cervini v. Cisneros*, 593 F. Supp. 3d 530 (W.D. Tex. 2023); Memorandum of Law of the United States Regarding the

Constitutionality and Interpretation of the "Support or Advocacy" Clause of 42 U.S.C. § 1985(3), Apr. 5, 2024, ECF No. 386 in *Cervini v. Cisneros*, No. AU:21-CV-00565-RP (W.D. Tex. 2023) (hereafter "Memorandum of Law of the United States") (attached hereto as Exh. 1).

113.    Parties to a Section 1985(3) conspiracy can include natural persons, corporations, private actors, state officials, and federal officials.

114.    Section 1985(3) creates a private cause of action against any and all such conspirators by any person injured in his person or property by acts taken in furtherance of the conspiracy, and in such actions the court may award injunctive relief as well as monetary damages.

115.    Expressing support for or advocacy of a presidential candidate qualifies as an act of support or advocacy "toward or in favor of the election of any lawfully qualified person as an elector for President" under the Support or Advocacy Clauses of Section 1985(3). *See, e.g.*, *Cervini v. Cisneros*, 593 F. Supp. 3d 530, 532, 539 (W.D. Tex. 2023) (recognizing cause of action under Support or Advocacy Clause where private actor defendants allegedly harassed individuals riding in a Biden-Harris campaign tour bus); Memorandum of Law of the United States, *supra*, at 1 (Support or Advocacy Clauses protect and apply to "support or advocacy of candidates in federal elections").

116.    An "injury" to "person or property" for Section 1985(3) purposes "does not need to be one of violence or bodily harm; rather, 'economic harm, legal action, dissemination of personal information," and intangible invasions of protected interests "can qualify depending on the circumstances.'" *Krabach*, 2023 U.S. Dist. LEXIS 191870, at *17 (quoting *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020)).

117.     Defendants have violated Section 1985(3) by conspiring to "to injure [citizens] in person or property on account of" their lawful "support or advocacy" in favor of Mr. Kennedy's presidential candidacy.

118.     Defendants conspired both with each other and with federal officials to effect such injury.

119.     Since early 2021, Defendants Meta, Facebook, Instagram, Zuckerberg, and John Doe Defendants 1-10 (officers and employees of Meta, Facebook, and Instagram whose identities are unknown to Plaintiffs) have on numerous occasions met with one another, communicated with one another, and collectively agreed to censor and shadow-ban Mr. Kennedy and content favorably mentioning or expressing support for him.

120.     After the release of *Who Is Bobby Kennedy*, Defendants met with one another, communicated with one another, and collectively agreed to censor and shadow-ban that film as well as other content expressing support or advocacy in favor of Mr. Kennedy's candidacy for president and to punish users who engaged in such support or advocacy.

121.     Facebook and Instagram each use human review teams as well as algorithms to perform what those platforms call "content moderation."

122.     Such human review teams are called upon to make judgments about "content moderation" with respect to important or potentially controversial matters.

123.     In particularly important cases, for example when the content at issue involves speech by or supportive of major political figures, "content moderation" decisions are "elevated" to higher executive officers at Facebook, Instagram, and Meta.

124.     Meta's responsible "content moderation" officers, including Defendant Zuckerberg, are well aware of Meta's involvement and controversial content moderation in past elections and must certainly be exercising oversight of the company's content moderation in this election.

125.     Such human review teams and/or executive officers at Facebook, Instagram and Meta made the decision to suppress (and continue suppressing) the censored pro-Kennedy content described above.

126.     It cannot be a coincidence that Facebook and Instagram, each of which is under the control of Meta, are both suppressing the same pro-Kennedy content.

127.     It is at a minimum highly likely, if not virtually certain, that Defendants Meta, Facebook, and Instagram, together with the responsible human review teams at each company, as well as the responsible officers and employees at each company (such human reviewers, officers, and employees named herein as John Doe Defendants) formed an agreement with one another to censor pro-Kennedy content.

128.     In addition to forming these agreements with one another, Defendants and their officers and agents met in person and communicated electronically with White House officials and many other federal officials innumerable times to discuss censorship policies and specific censorship decisions. *See, e.g., Missouri*, 2023 U.S. Dist. LEXIS 114585, at *13-35; Congressional Report, *supra*, at 10-51.

129.     In and through these communications, Meta, Facebook, Instagram, and Zuckerberg formed a self-described "partnership" agreement with the White House and other federal entities and officials to adopt and implement policies: (a) to censor content disfavored by the Biden Administration, including specifically speech that questioned COVID vaccines, even when such content was factually true or protected opinion, including discussions of vaccine opposition framed in terms of constitutional rights or civil liberties; (b) to undermine such speech and reduce its appeal and effect, including by falsely communicating to users that the content was "misinformation"; (c) to threaten users who persisted in seeking to post or share such content

with suspension, de-platforming, account freezing, account termination, and/or other punitive

measures; and (d) to take such punitive actions against users who sought to post or share such

content.

130.    Defendant Zuckerberg (as well as other senior Meta executives) played a direct and

significant role in deciding on Meta's response to the Government's communications and in

forging Meta's "partnership" with the Government.  *See, e.g.*, Congressional Report, *supra*, at 10

("After months of pressure, top Facebook executives, including Mark Zuckerberg, Sheryl

Sandberg, and Nick Clegg decided that Facebook had 'bigger fish to fry' with the Biden

Administration, such as issues related to 'data flows,' and defending free expression on the

companies' platforms was not worth drawing the ire of the [most] powerful office in the

world.").

131.    By and through these agreements—with one another and with federal officials—

Defendants conspired to inflict injury on voting citizens (including Mr. Kennedy and Ms. Reed

Kraus) who engaged in support or advocacy favoring Mr. Kennedy, and such injuries included:

suspending or disabling Facebook and Instagram users' social media accounts; depriving

Facebook and Instagram users of control over their social media accounts; depriving Facebook

and Instagram users of moneys earned through or in connection with their social media accounts;

causing intimidation and fear of loss by threatening users with account termination; injuring Mr.

Kennedy's reputation; and injuring Mr. Kennedy's presidential campaign.

132.    Defendants took innumerable actions in furtherance of this conspiracy, including: (A)

every act of censorship (including shadow-banning, removal of content, blocking of content,

restricting reach of content, account restrictions, and account suspensions) they imposed on users

who sought to share *Who Is Bobby Kennedy* or to engage in other pro-Kennedy speech; (B) every

act of disseminating false, disparaging statements about *Who Is Bobby Kennedy*; and (C) every

other act of censorship, threatened account suspension, and actual account suspension, described

above directed at users who expressed support or advocacy in favor of Mr. Kennedy.

133.     As a result of these actions, Defendants effected all the injuries enumerated above.

134.     As a result of these actions, Plaintiff AV24 suffered injury to property, including:

economic harm; reputational harm; the suppressed reach of AV24's film *Who Is Bobby Kennedy*;

the loss of value of *Who Is Bobby Kennedy*; and the loss of donations as a result of the

suppression of *Who Is Bobby Kennedy*.

135.     As a result of these actions, Plaintiff Kennedy suffered injury to person and property,

including: economic harm; reputational harm; loss of donations; and damage to his presidential

campaign.

136.     As a result of these actions, Plaintiff Reed Kraus suffered injury to person and property,

including: suspension or disabling of her social media account; deprivation of control over her

social media accounts; deprivation of moneys earned through or in connection with her social

media account; and intimidation and fear of loss as a result of threatened termination of social

media accounts.

137.     Accordingly, under Section 1985(3), all Plaintiffs were injured in their persons and

property through acts taken in furtherance of the Defendants' conspiracies, and were moreover

deprived of having and exercising their rights and privileges as citizens to support and advocate

for the presidential candidate of their choice, and may therefore sue each and every one of the

Defendants conspired with one another, and with federal officials, to injure users of Facebook

and Instagram who posted content in support of Mr. Kennedy's candidacy for President.

1

2

3

**COUNT THREE:**
**CONSPIRACY TO PREVENT SUPPORT AND ADVOCACY**
**IN VIOLATION OF 42 U.S.C. § 1985(3)**

4
138.    All foregoing allegations are repeated and realleged.

5
139.    Section 1985(3) also, independently. prohibits conspiracies to "prevent by force,

6
intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or

7
advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as

8
an elector for President." 42 U.S.C. § 1985(3).

9
140.    The words "threat," "intimidation," and "injury" in federal statutes protecting against

10
election interference and prohibiting private actors from hindering citizens seeking to engage in

11
lawful election activity encompass not only physical violence but also misrepresentation

12
intended to prevent or dissuade people from engaging in such activity. *See, e.g.*, *United States v.*

13
*Mackey*, No. 21-CR-80 (AMD)**,** 2023 U.S. Dist. LEXIS 186646, at *65-66 (E.D.N.Y. Oct. 17,

14
2023) (upholding conviction for disseminating false information online intended to trick people

15
into not voting, and holding that the words "injure, oppress, threaten, or intimidate" in 18 U.S.C.

16
§ 241 encompass not only "violence," but also **"*false utterances*"**) (emphasis added).

17
141.    The non-consented-to blocking of support or advocacy of a presidential candidate that

18
does not violate any of Defendants' terms of service qualifies as an act of "force" for Section

19
1985(3) purposes.

20
142.    The punitive restriction or suspension of users' social media accounts on account of

21
engaging in such support or advocacy qualifies as an act of "force" for Section 1985(3) purposes.

22
143.    The threat to suspend or other punish for posting, watching, sharing, or linking to such

23
support or advocacy qualifies as "intimidation or threat" for Section 1985(3) purposes.

24

25

26

144.     Through the agreements described above—both with one another and with federal officials—Defendants conspired to prevent citizens from posting or sharing *Who Is Bobby Kennedy* and from engaging in other support or advocacy favoring Mr. Kennedy's candidacy through such acts of misrepresentation, force, threat, and intimidation.

145.     Defendants took innumerable actions in furtherance of this conspiracy, including: (A) every act of censorship (including shadow-banning, removal of content, blocking of content, restricting reach of content, account restrictions, and account suspensions) they imposed on users who sought to share *Who Is Bobby Kennedy* or to engage in other pro-Kennedy speech; (B) every act of disseminating false, disparaging statements about *Who Is Bobby Kennedy*.

146.     As a result of these actions, Plaintiff AV24 suffered injury to property, including: economic harm; reputational harm; the suppressed reach of AV24's film *Who Is Bobby Kennedy*; the loss of value of *Who Is Bobby Kennedy*; and the loss of donations as a result of the suppression of *Who Is Bobby Kennedy*.

147.     As a result of these actions, Plaintiff Kennedy suffered injury to person and property, including: economic harm; reputational harm; loss of donations; and damage to his presidential campaign.

148.     As a result of these actions, Plaintiff Reed Kraus suffered injury to person and property, including: suspension or disabling of her social media accounts; deprivation of control over her social media account; deprivation of moneys earned through or in connection with her social media account; and intimidation and fear of loss as a result of threatened termination of social media accounts.

149.     Accordingly, under Section 1985(3), all Plaintiffs were injured in their persons and property through acts taken in furtherance of the Defendants' conspiracy, and were moreover

deprived of having and exercising their rights and privileges as citizens to support and advocate for the presidential candidate of their choice, and may therefore sue each and every one of the Defendants.

**COUNT FOUR:**
**VIOLATION OF 42 U.S.C. § 1986**

150.     All foregoing allegations are repeated and realleged.

151.     Under Section 1986 of the Civil Rights Act of 1871, a person who knows that a Section 1985 wrong is "about to be committed," and who has the power "to prevent or aid in preventing the commission thereof," acts unlawfully if he "neglects or refuses to do so."  42 U.S.C. § 1986.

152.     Through its officers and employees, Defendant Meta knew that all the Section 1985 wrongs described above were about to be committed and had power to prevent those wrongs and neglected or refused to do so.

153.     In addition, Defendant Zuckerberg, as Meta's famously hands-on CEO, must have known and did know that Meta was censoring *Who Is Bobby Kennedy*, and that the Section 1985 wrongs described above were about to be committed (and still are being committed), had power to prevent those wrongs, and neglected or refused to do so.

154.     In addition, certain unknown John Doe Defendants knew that the Section 1985 wrongs described above were about to be committed, had power to prevent those wrongs and neglected or refused to do so.

155.     Accordingly, Defendants Meta, Zuckerberg and certain of the John Does violated 42 U.S.C. § 1986 and are liable for all damage caused.

**COUNT FIVE:**
**VIOLATION OF THE FIRST AMENDMENT**

156.     All preceding allegations are repeated and realleged.

1

2      157.    Defendants' above-described censorship of pro-Kennedy speech is the result of joint

3      action with, and pressure from, federal governmental actors.

4      158.    A years-long, systematic campaign by the White House and other federal entities and

5      officials to induce the country's dominant social media platforms—prominently including Meta

6      —to censor protected speech has been found by the District Court of the Western District of

7      Louisiana[4] and by the United States Court of Appeals for the Fifth Circuit[5] to constitute

8      sufficient coercion, significant encouragement, and collusion to turn social media censorship into

9      state action in violation of the First Amendment.[6]

10     159.    Those Courts also found, expressly and specifically, that the Federal Government has

11     specifically targeted Mr. Kennedy for censorship and that Meta has specifically censored him at

12     the Government's behest.

13     160.    The opinions issued, and detailed factual findings made, by those courts are incorporated

14     herein by reference and are, in any event, publicly available, and Plaintiffs assert their First

15     Amendment claims on the basis of those detailed factual findings as well as on the basis of the

16     allegations set forth above.

17     161.    In addition, a May 1, 2024 congressional report (the "Congressional Report")[7] detailing

18     the Administration's social-media censorship campaign is also incorporated herein by reference,

19

20     _____

       [4] *See Kennedy v. Biden*, No. 3:23-CV-00381, 2024 U.S. Dist. LEXIS 26751 (W.D. La. Feb. 14,

21     2024).
       [5] *See Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023).

22     [6] The injunction issued by the District Court and affirmed as modified by the Fifth Circuit was
       reversed on standing grounds by the Supreme Court in *Murthy v. Missouri*, No. 23-411, 2024

23     U.S. LEXIS 2842 (U.S. June 26, 2024), but the High Court did not reach the merits.
       [7] U.S. HOUSE OF REPRESENTATIVES, COMMITTEE ON THE JUDICIARY AND THE SELECT

24     SUBCOMMITTEE ON THE WEAPONIZATION OF THE FEDERAL GOVERNMENT, *The Censorship-
       Industrial Complex: How Top Biden White House Officials Coerced Big Tech To Censor*

25     *Americans, True Information, And Critics Of The Biden Administration* at 1 (May 1, 2024),

26

1

2   and Plaintiffs also assert their First Amendment claims on the basis of the copiously documented

3   communications between Defendants and the Federal Government described and quoted in that

4   report.

5   162.    A summary of key relevant facts follows.

6   163.    Barely three days into the Biden Administration, "[a]t 1:04 a.m. on January 23, 2021, the

7   White House flagged an anti-vaccine tweet by Robert F. Kennedy, Jr. ('RFK Jr.') and instructed

8   Twitter to 'get moving on the process for having it removed ASAP.' . . .  Thus began a campaign

9   of 'unrelenting pressure from the most powerful office in the world' to 'bend [social-media

10   platforms] to the government's will.'" Brief of Respondents at 3, Feb. 2, 2024, *Murthy v.

11   Missouri*, No. 23-411 (U.S. 2023) (quoting *Missouri v. Biden*, 83 F.4th 350, 371 (5th Cir. 2023)).

12   164.    As Supreme Court Justice Samuel Alito put it, since early 2021, "Government officials

13   have asked social media platforms to block Mr. Kennedy's efforts to communicate with the

14   public and that the platforms have complied." *Murthy v. Missouri*, 144 S. Ct. 32, 32 (2023)

15   (Alito, J., dissenting from denial of motion to intervene) (describing findings made in *Missouri v.

16   Biden*, No. 3:22-CV-01213, 2023 U.S. Dist. LEXIS 114585, at *5, 9, 40 (W.D. La. July 4,

17   2023)).

18   165.    As the Congressional Report states, "[b]y the end of 2021, Facebook, YouTube, and

19   Amazon changed their content moderation policies in ways that were directly responsive" to

20   requests and demands made by the Biden Administration.[8]

21

22

23

24   https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Biden-WH-Censorship-Report-final.pdf.

25   [8] *Id.*

26

166.     With extensive quotation from internal Facebook emails and other documents, the Congressional Report describes the "collusion" between Facebook and the White House eventually resulting in an agreement by Facebook pursuant to which the platform would and did implement censorship policies suppressing critics of the Administration, particularly critics of its COVID policies, specifically including Mr. Kennedy.[9]

167.     Mr. Kennedy is only one of innumerable Americans whom the country's behemoth social media platforms censored in collusion and partnership with the White House and other government entities and officials, in what the Western District of Louisiana has called "arguably the most massive attack against free speech in United States history." *Missouri v. Biden*, 2023 U.S. Dist. LEXIS 114585, at *158.

168.     In this "massive attack against free speech," Meta has been the government's censor-in-chief.

169.     At the urging of, and in conspiracy with, the White House, Meta agreed to censor and does censor content that does not violate Facebook's policy.

170.     In communications with federal officials about whom and what to censor, Meta has offered itself as, and acted as, a "partner" with the White House "to drive behavior." *See id.* at *18 ("Meta also stated [in email communications with the White House], 'We think there is considerably more we can do in "*partnership*" with you and your team to drive behavior.'") (emphasis by the Court)).

171.     At the urging of, and in conspiracy with, the White House, Meta censors content that does not contain misinformation. *See, e.g.*, *id.* at *20 ("Facebook noted [in internal emails]

_____

[9] *See id*. at 8, 10-51; *id*. at 44 (deplatforming of Mr. Kennedy from Instagram).

that in response to White House demands, it was censoring, removing, and reducing the virality of content discouraging vaccines '***that does not contain actionable misinformation***.'") (emphasis added).

172.    But in public Meta says the opposite.

173.    On its content-moderation COVID policy pages, Meta fraudulently and falsely represents that it censors only misinformation.

174.    These misrepresentations falsely communicate to users and the public that when Meta censors COVID- or vaccine-related content, the censored content is factually false or at the very least, that Meta has made a determination that the censored content is factually false.

175.    At the urging of, and in conspiracy with, the White House, Meta has by its own admission even censored discussions of constitutional rights and civil liberties, knowing that such speech contained no misinformation and did not otherwise violate any Meta policies. *See, e.g.*, *id*. at \*24 ("Other content that Facebook admitted did not violate its policy but may contribute to vaccine hesitancy [included] ***discussing the choice to vaccinate in terms of personal or civil liberties*** . . . . Facebook noted it censors such content through a 'spectrum of levers' that includes concealing the content from other users, 'de-boosting' the content, and preventing sharing through 'friction.'") (emphasis added).

176.    Last February, the Western District of Louisiana issued an injunction against numerous federal agencies and officials in favor of Mr. Kennedy to put a halt to such censorship against him. *See Kennedy v. Biden*, No. 3:23-CV-00381, 2024 U.S. Dist. LEXIS 26751 (W.D. La. Feb. 14, 2024). The injunction is currently on appeal in the Fifth Circuit.

177.     In that ruling, the District Court made express, specific factual findings Meta Platforms

had worked jointly with the Federal Government to specifically target Mr. Kennedy for

censorship. *Id.* at *13-14.[10]

178.     In addition, the District Court found that Mr. Kennedy (together with the other plaintiffs

in the proceedings) had "produced evidence of a massive effort by Defendants, from the White

House to federal agencies, to suppress speech based on its content," "likely result[ing] in

millions of free speech violations." *Id.* at *30.

179.     Meta's censorship policies with respect to COVID- and vaccine-related content in

particular—its actual policies, as well as the policies it publicly proclaims—are the product of

government coercion and significant encouragement, and of Meta's participation in joint action

with the government, and are therefore state action for constitutional purposes.

180.     One of the principal means by which the White House and other federal actors coerced

and colluded in social media censorship was by inducing social media companies to "alter[] their

algorithms," change their content moderation policies, and change their terms of service.

*Missouri*, 83 F.4th at 397; *see also Missouri*, 2023 U.S. Dist. LEXIS 114585, at *159 (Federal

Defendants pressured social media companies to change their policies to suppress free speech).

---

[10] The Supreme Court's recent decision reversing an injunction in a related case, *see Murthy v. Missouri*, No. 23-411, 2024 U.S. LEXIS 2842 (U.S. June 26, 2024), was based solely on standing, did *not* reach the merits, and has no effect on the factual findings in *Kennedy v. Biden*. Indeed, all three Justices who did reach the merits in *Murthy* would have affirmed the lower courts' First Amendment holdings. *See id.* at *47, 51, 78-92 (Alito, J., dissenting) ("What the officials did in this case … was blatantly unconstitutional, and the country may come to regret the Court's failure to say so.").

181.     Meta has for years been specifically censoring Mr. Kennedy in collusion with, and under pressure from, the Federal Government, and such censorship is therefore state action for constitutional purposes.

182.     Moreover, Meta has for years been censoring Mr. Kennedy (and countless others) in implementation of its state-action COVID-related algorithms, policies, and terms of service.

183.     Meta has effected this censorship even though Meta knew that the speech it was censoring was constitutionally protected.

184.     Defendants' censorship of Mr. Kennedy, of individuals seeking to listen to his speech or share that speech, of *Who Is Bobby Kennedy*, and of other pro-Kennedy speech is state action because it is the result of federal pressure and/or willing participation in joint activity with the Federal Government.

185.     Such censorship is content- and viewpoint-based and therefore unconstitutional.

186.     Such censorship is ongoing and indeed intensifying, inflicting present and continuing First Amendment injury on Plaintiffs Kennedy, AV24 and Reed Kraus.

187.     Accordingly, Defendants are violating Plaintiffs' First Amendment rights, and Plaintiffs are entitled to injunctive relief.

### DEMAND FOR JURY TRIAL

188.     Plaintiff demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

189.     WHEREFORE, Plaintiffs respectfully request:

          A.     Compensatory damages in an amount to be determined by the Jury;

          B.     An injunction judgment ordering Defendants (i) to desist from any further censorship of *Who is Bobby Kennedy*; (ii) to desist from any further threats to take punitive

action against users who try to watch, share or post links to that film or otherwise express support or advocacy for Mr. Kennedy's candidacy; (iii) to desist from any further misrepresentations of that film; (iv) to desist from any further censorship (including "shadow-banning," "de-boosting," and all other forms of reducing reach) of support, advocacy, encouragement to vote, or urging to vote for Mr. Kennedy; (v) to immediately implement changes to Meta, Facebook, and Instagram content-moderation algorithms to stop all flagging, marking, censoring, and filtering of any kind based on the fact that content contains, refers or relates to Mr. Kennedy; (vi) to lift any suspensions, restrictions or other measures taken against users for expressing support or advocacy for Mr. Kennedy; (vii) to send all users a message saying expressly that content will not censored or deemed in violation of community standards merely because it expresses support for or advocates on behalf of Mr. Kennedy; and (viii) to desist from any further collusion with federal officials to censor speech by or supportive of Mr. Kennedy.

C.      An award of attorneys' fees and costs to Plaintiffs;

D.      An award of punitive damages to Plaintiffs in an amount to be determined at trial;

E.      An order requiring Defendants to make a public retraction of their false statements;

F.      A declaratory judgment declaring that Defendants have violated the First Amendment, Section 11(b) of the Voting Rights Act, 42 U.S.C. § 1985, and 42 U.S.C. § 1986 through the acts described above; and

G.      An award of such other and further relief as the Court may deem just and proper.

Dated: July 23, 2024.

Respectfully submitted,

1

2

_-s-_
_____
3    JED RUBENFELD
      (NY Bar # 2214104)
4    (pro hac vice forthcoming)
      1031 Forest Rd.
5    New Haven, CT 06515
      Telephone: (203) 432-7631
6    E-mail: jed.rubenfeld@yale.edu

7    Attorney for Plaintiffs American Values 2024 and Jessica Reed Kraus

8

_-s-_
_____
9    ROGER I. TEICH
      California State Bar No. 147076
10   337 Liberty Street
      San Francisco, CA 94114
11   Telephone:  (415) 948-0045
      E-mail: rteich@juno.com
12
      Attorney for Plaintiff American Values 2024
13

14

_-s-_
_____
15   RICHARD JAFFE, ESQ.
      California Bar No. 289362
16   428 J Street, 4th Floor
      Sacramento, California 95814
17   Tel: 916-492-6038
      Fax: 713-626-9420
18   E-mail: rickjaffeesquire@gmail.com

19   Attorney for Plaintiffs Robert F. Kennedy, Jr. and Jessica Reed Kraus

20

21

22

23

24

25

26

**VERIFICATION**

I, ANTHONY LYONS, declare under penalty of perjury as follows:

1.      I am the Treasurer for American Values 2024 (AV24), a political action committee and one of the Plaintiffs in this action.

2.      I have reviewed the foregoing First Amended Complaint and declare that the facts set out therein are true to the best of my knowledge and belief, except those matters stated as upon information and belief, which are true to the best of my belief.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 22nd day of July, 2024.

_____
Anthony Lyons

I am the electronic filer of this document, and I hereby attest that Anthony Lyons, signatory of this document, concurs in the filing hereof.

_____
-s-
Roger Teich

_____
-s-
Rick Jaffe