JED RUBENFELD
NY Bar # 2214104
1031 Forest Rd.
New Haven, CT 06515
Telephone: (203) 432-7631
E-mail: jed.rubenfeld@yale.edu

Attorney for Plaintiffs American Values 24 and Jessica Reed Kraus

ROGER I. TEICH
California State Bar No. 147076
337 Liberty Street
San Francisco, CA 94114
Telephone: (415) 948-0045
E-Mail Address: rteich@juno.com

Attorney for Plaintiff American Values 2024

RICHARD JAFFE, ESQ.
California State Bar No. 289362
428 J Street, 4th Floor
Sacramento, California 95814
Tel: (916) 492-6038
E-Mail: rickjaffeesquire@gmail.com

Attorney for Plaintiffs Robert F. Kennedy, Jr. and Jessica Reed Kraus

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT F. KENNEDY, JR., AMERICAN VALUES 2024, and JESSICA REED KRAUS, <br>                    *Plaintiffs*, <br> -v.- <br><br> META PLATFORMS, INC., FACEBOOK OPERATIONS, LLC, INSTAGRAM, LLC, MARK ZUCKERBERG, and JOHN DOES 1-10, <br>                    *Defendants*. | **Case Number:** 3:24-cv-02869 <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF SUPPORT; DECLARATION OF BRIGID RASMUSSEN; AND DECLARTION OF JESSICA REED KRAUSS** <br><br> **Date: August 28, 2024** <br> **Time:  2:00 PM** <br> **Courtroom: 2, 17th Floor** |

1

2 **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3        **PLEASE TAKE NOTICE** that on Wednesday August 28, at 2:00 PM or as soon as

4 counsel may be heard, at the United States District Court for the Northern District of California,

5 450 Golden Gate Avenue, San Francisco, CA 94102 in courtroom number 2, 17th Floor, the

   Plaintiffs will move for an order granting preliminary injunctive relief.

6        Pursuant to Federal Rules of Civil Procedure 65, Plaintiffs seek a preliminary injunction,

7 as set forth in more detail in the accompanying [PROPOSED] Order, to enjoin Defendants Meta

8 Platforms, Inc., Facebook Operations, LLC, Instagram, LLC, Mark Zuckerberg, and John Does

9 1-10 from continuing to censor and penalize citizens who express support or advocacy for

   Plaintiff Robert F. Kennedy, Jr., and his presidential campaign.

10        This motion is based on the accompanying Memorandum of Law, the Declarations of

11 Brigid Rasmussen and Jessica Reed Kraus, the separately filed Verified First Amended

12 Complaint ("FAC"), all papers which may be submitted prior to the time of the hearing, any oral

   argument, and any further evidence which may be offered.

13        As set forth in the verified FAC ¶¶ 16-22, Defendants' electoral interference is causing

14 grave, irreparable harm requiring immediate injunctive relief, and there is good cause to grant the

15 relief requested. The Defendants' well-documented censoring, removing, and deprioritizing

   support for Robet F. Kennedy Jr.'s presidential candidacy violate Section 11(b) of the Voting

16 Rights Act, 42 U.S.C. §§ 1985(3), 1986, and the First Amendment, as set forth hereinafter.

17 Given the short time remaining before the election, expeditious injunctive relief is justified.

18 RESPECTFULLY SUBMITTED on this 23rd day of July, 2024.

19        _-s-_
   _____
20 JED RUBENFELD
   NY Bar # 2214104
21 1031 Forest Rd.
   New Haven, CT 06515
22 Telephone: (203) 432-7631
   E-mail: jed.rubenfeld@yale.edu

23 Attorney for Plaintiffs AV24 and Jessica Reed Kraus

24

25

26                                                    2

1

2

_____ *-s-*

ROGER I. TEICH

3      California State Bar No. 147076
       337 Liberty Street

4      San Francisco, CA 94114
       Telephone: (415) 948-0045

5      E-Mail Address: rteich@juno.com

6      Attorney for Plaintiff American Values 2024

7

_____ *-s-*

8      RICHARD JAFFE, ESQ.
       California State Bar No. 289362

9      428 J Street, 4th Floor
       Sacramento, California 95814

10     Tel: (916) 492-6038
       Email: rickjaffeesquire@gmail.com

11

12     Attorney for Plaintiffs Robert F. Kennedy, Jr. and Jessica Reed Kraus

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1

2

**TABLE OF CONTENTS**

3

Introduction and Statement of Issues…………………………………………..    1

Statement of Facts……………………………………………………………    2

Argument……………………………………………………………………    9

      I.       Preliminary Injunction Standard of Review……………………    9

      II.     Plaintiffs Have Established a Likelihood of Success
              on the Merits or, at a Minimum, Have Established Serious
              Questions Going to the Merits…………………………………    10

      III.    As a Matter of Law, Irreparable Harm, The Equities, and the
              Public Interest All Sharply Favor Plaintiffs……………………    22

Conclusion……………………………………………………………………    23

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

i

1

2

**TABLE OF AUTHORITIES**

3

**Cases**

*Allen v. City of Graham*, No. 20-cv-997, 2021 WL 2223772 (M.D.N.C. June 2, 2021) ............. 11

*American Bev. Ass'n v. City & County of San Francisco*, 916 F.3d 749 (9th Cir. 2019) ............ 23

*Ariz. Alliance for Retired Americans. v. Clean Elections USA*, 638 F. Supp. 3d 1033 (D. Ariz. 2022) ................................................................................................................................... 11

*Biden v. Nebraska*, 600 U.S. 477 (2023) ........................................................................................ 20

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) ............................................. 15

*Cervini v. Cisneros*, 593 F. Supp. 3d 530 (W.D. Tex. 2023) ...................................................... 16

*Cine Sk8, Inc. v. Town of Henrietta*, 507 F.3d 778 (2d Cir. 2007) ............................................ 17

*CTIA v. City of Berkeley*, 928 F.3d 832 (9th Cir. 2019) ............................................................ 22

*Daschle v. Thune*, No. 04-cv5 Case 1:22-cv-00581-CNS-NRN (D.S.D. Nov. 2, 2004) ............. 11

*Erisat-Eritrean Satellite TV v. Gebrekidan*, No. CV 24-1121-DMG, 2024 U.S. Dist. LEXIS 55623 (C.D. Cal. Mar. 5, 2024) ........................................................................................... 13

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180 (9th Cir. 2024) ........... 9

*Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621 (2nd Cir. 1989) ......................... 20

*Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265 (8th Cir. 1990) ................................. 16

*HiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985 (9th Cir. 2019) ............................................... 13

*Jackson v. Riddell*, 476 F. Supp. 849 (S.D. Miss. 1979) ............................................................ 10

*K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087 (9th Cir. 1972) ........................................................ 1

*Kennedy v. Biden*, No. 23-CV-00381, 2024 U.S. Dist. LEXIS 26751 (W.D. La. Feb. 14, 2024).. 3

*Krabach v. King Cnty.*, No. 2:22-cv-1252-BJR, 2023 U.S. Dist. LEXIS 191870 (W.D. Wash. Oct. 25, 2023) ................................................................................................................ 11, 12, 18

*Kush v. Rutledge*, 460 U.S. 719 (1983) ....................................................................................... 16

*McAlister v. Alaska*, No. 3:23-cv-0029-HRH, 2023 U.S. Dist. LEXIS 85067 (D. Alaska May 16, 2023) .................................................................................................................................. 15

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) .................................................................... 23

*Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023) ............................................................ 3

*Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023) ......................................................................... 21

*Murthy v. Missouri*, 144 S. Ct. 32 (2023) ..................................................................................... 3

*Murthy v. Missouri*, No. 23-411, 2024 U.S. LEXIS 2842 (U.S. June 26, 2024) ......................... 21

*Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020) ....................................................................................................................................... passim

*O. H. v. Oakland Unified Sch. Dist.*, No. C-99-5123 JCS, 2000 U.S. Dist. LEXIS 21725 (N.D. Cal. Apr. 17, 2000) .............................................................................................................. 17

*Paynes v. Lee*, 377 F.2d 61 (5th Cir. 1967) ............................................................................... 16

*Ramos v. Wolf*, 975 F.3d 872 (2020) .......................................................................................... 10

*Rashdan v. Geissberger*, No. 10-00634 SBA, 2011 U.S. Dist. LEXIS 4792 (N.D. Cal. Jan. 14, 2011) .................................................................................................................................. 17

*Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16 Civ. 2555 (KMW), 2017 U.S. Dist. LEXIS 6871 (S.D.N.Y. Jan. 18, 2017) ............................................................................................. 13

ii

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011)........................................... 1

*United States v. Bibbins*, 637 F.3d 1087 (9th Cir. 2011) ............................................... 13

*United States v. Elliott*, 835 F. Appx. 78 (6th Cir. 2020) ............................................ 14

*United States v. Farias-Contreras*, 104 F.4th 22 (9th Cir. 2024).................................... 12

*United States v. Mackey*, No. 21-CR-80 (AMD), 2023 U.S. Dist. LEXIS 186646 (E.D.N.Y. Oct. 17, 2023)........................................................................................................... 14

*United States v. Palomino*, 599 F. Appx. 638 (9th Cir. 2015)....................................... 12

*United States v. Taylor*, 596 U.S. 845 (2022)................................................................ 13

*Viera v. Gen. Auto. Ins. Servs. & Permanent Assur. Corp.*, No. 3:19-cv-00901, 2021 U.S. Dist. LEXIS 21424 (M.D. Tenn. Feb. 4, 2021) ........................................................ 13

*Washington v. Duty Free Shoppers*, 696 F. Supp. 1323 (N.D. Cal. 1988) ..................... 17

1

2

3

## MEMORANDUM IN SUPPORTOF MOTION

## <u>INTRODUCTION AND STATEMENT OF ISSUES TO BE DECIDED</u>

It was Plaintiffs' hope, when they filed this case on May 13, 2024, that the Complaint would put Defendants on notice of the illegality of their brazen censorship of speech supporting Independent presidential candidate Robert F. Kennedy, Jr., and persuade them to halt their unlawful conduct. Instead, Defendants' censorship has intensified so radically that Plaintiffs are now required to amend their Complaint and seek immediate injunctive relief.

In the last sixty days, Defendants have begun preventing users from simply expressing support for Mr. Kennedy's candidacy or urging others to vote for him. For example, Defendants have blocked the following posts on Facebook and Instagram:

- "Kennedy all the way!"
- "VOTE KENNEDY"
- "Time to add Kennedy to the mix"
- "#letbobbydebate"[1]

At the same time, Defendants are now removing and suppressing[2] links concerning Kennedy campaign events. (FAC ¶ 12.) One major such event was the online "Real Debate," in which Mr. Kennedy answered on camera (in real time) the same questions put to candidates Donald Trump and Joe Biden at CNN's June 27 presidential debate. On X (formerly known as

---

[1] *See* Verified First Amended Complaint (hereafter "FAC") ¶ 8. "A verified complaint may be treated as an affidavit, and, as such, it is evidence that may support injunctive relief." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011); *accord*, *K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) ("verified complaint . . . may afford the basis for a preliminary injunction"); WRIGHT & MILLER, 11A FED. PRAC. & PROC. CIV. § 2949 (3d ed. 2020) ("pleadings may be considered" in support of injunction "if they have been verified").

[2] Meta uses a variety of devices and strategies to secretly demote, hide, and/or limit the visibility and reach of disfavored content—practices known, among other names, as "shadow-banning," "demoting," "sand-boxing," or "de-boosting." (FAC ¶¶ 11 n.1, 48.)

1

Twitter), five million people watched Kennedy's "Real Debate," but on Meta's platforms, users were: blocked from posting links to it; prevented from marking "Going" or "Interested" on "The Real Debate Watch Party" pages; and prevented from posting content containing Mr. Kennedy's closing remarks. (FAC ¶ 13; Declaration of Brigid Rasmussen (hereafter "Rasmussen Dec.") (attached hereto) ¶¶ 18, 20-21, 30.)

Astonishingly, Defendants are even obstructing Plaintiffs from gathering evidence for this case.  Defendants are now blocking links to www.kennedycensored.com, a website that invites visitors to report examples of pro-Kennedy comments and posts that Defendants and other social-media platforms have censored. (FAC ¶ 15.)

None of the censored content just described violates any Meta terms of service. (FAC ¶ 62.) Thus Defendants are blocking lawful support and advocacy for a presidential candidate, and still worse, they are threatening users who engage in it with account suspension or termination. (FAC ¶ 11.) The primary issue before the Court is whether such conduct violates Section 11(b) of the Voting Rights Act and the Support or Advocacy Clauses of the Civil Rights Act of 1871 (codified in Section 1985(3)).  As will be shown below, it does.

Defendants' increasingly broad and brazen election interference—just months before the presidential election—is unlawful, intolerable and causing grave, immediate, irreparable harm. The American people have a right to a presidential election decided through free speech and by voters, not by corporations exercising historically unprecedented power over the content of public discourse.

## STATEMENT OF FACTS

For years, Defendant Meta Platforms has been censoring Mr. Kennedy, and it has been doing so in collusion with the federal government. Since at least January 2021—as was found on

2

the basis of a voluminous evidentiary record by the United States District Court for the Western

District of Louisiana—"Government officials have asked social media platforms to block Mr.

Kennedy's efforts to communicate with the public," and "the platforms have complied." *Murthy*

*v. Missouri*, 144 S. Ct. 32, 32 (2023) (Alito, J., dissenting from denial of leave to intervene)

(describing factual findings made in *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023)).

　　Last February, the Western District of Louisiana issued an injunction against numerous

federal actors in favor of Mr. Kennedy to halt such censorship. *See Kennedy v. Biden*, No. 3:23-

CV-00381, 2024 U.S. Dist. LEXIS 26751 (W.D. La. Feb. 14, 2024).[3]   In that ruling, the District

Court made express, specific factual findings Meta Platforms had worked jointly with the

Federal Government to specifically target Mr. Kennedy for censorship. *Id.* at *13-14.[4] The

District Court found it likely that social media censorship in collusion with the Federal

Government was still ongoing and "certainly likely that Defendants could use their power over

millions of people to suppress alternative views or moderate content they do not agree with in the

upcoming 2024 national election." *Id*. at *27-28. Unfortunately, the District Court's prediction

has now vividly materialized.

　　On May 3, 2024, Plaintiff American Values 2024 ("AV24"), a political action committee

supporting Mr. Kennedy, released online a thirty-minute documentary film called *Who Is Bobby*

---

[3] That injunction is currently on appeal before the Fifth Circuit. (No. 24-30252 (5th Cir.).)
[4] The Supreme Court's recent decision reversing an injunction in a related case, *see Murthy v. Missouri*, No. 23-411, 2024 U.S. LEXIS 2842 (U.S. June 26, 2024), was based solely on standing, did *not* reach the merits, and has no effect on the relevant factual findings in *Kennedy v. Biden*. All three Justices who did reach the merits in *Murthy* agreed with the lower courts' First Amendment holdings. *See id.* at *47, 51, 78-92 (Alito, J., dissenting) ("What the officials did in this case … was blatantly unconstitutional, and the country may come to regret the Court's failure to say so.").

*Kennedy?*[5]  (FAC ¶ 23.)  The film is the property of AV24, which paid approximately one million dollars to make it, and is narrated by award-winning actor Woody Harrelson.  (FAC ¶¶ 25-26.)  *Who Is Bobby Kennedy* offers a simple, honest look at Mr. Kennedy's life, formative experiences, accomplishments, character, and values—especially his belief in America and her founding principles—inviting voters to make up their own minds about him, rather than accepting falsehoods repeatedly asserted by major news outlets and social media companies. (FAC ¶ 24.)   Clips of past interviews with Mr. Kennedy are featured prominently in *Who Is Bobby Kennedy*, so that his own speech is central to the film. (FAC ¶ 27.)

   *Who Is Bobby Kennedy* quickly began trending on X, but Defendants censored it. Facebook blocked and removed the film's trailer when users tried to post it on their own pages. Facebook and Instagram users who attempted to watch, share, or simply post links to the film were prevented from doing so and threatened with suspension of their accounts and other punitive action if they persisted in such activity.[6]  (FAC ¶¶ 28-35.)  Defendants made good on these threats, imposing account restrictions and suspensions on those who tried to share the film. (FAC ¶¶ 36, 47.)  Defendants' censorship of *Who Is Bobby Kennedy* has prevented the film from reaching tens of millions of Facebook and Instagram users, and millions more people with whom those Facebook and Instagram users would have shared the film. (FAC ¶ 53.)

   Facebook and Instagram users received messages asserting a wide variety of fraudulent explanations for this censorship, including suggestions that *Who Is Bobby Kennedy* was "spam,"

---

[5] The film can be viewed at www.whoisbobbykennedy.com. (Rasmussen Dec. ¶ 34.)
[6] The Kennedy campaign has received hundreds of screenshots from third-party users showing the threats, intimidation and sanctions the users themselves received from Meta for attempting to watch, post or link to the film. A true and correct copy of a representative selection of these screenshots is attached as Rasmussen Ex. A.

that it "praise[d] organized crime or hate groups," that it "solicit[ed] sexual services," that it contained "sexual activity," that it contained "violent or graphic content," that it offered the "sale of firearms or drugs," that it "may be malicious," or that it contained COVID-related misinformation. (FAC ¶ 37; Rasmussen Dec. at ¶¶ 8-14 & Ex. A.)

All these suggestions were absurd. There is no sexual content in *Who Is Bobby Kennedy*, no graphic or violent content, no offers for the sale of firearms or drugs, no misinformation about COVID (indeed virtually no references to COVID at all), and nothing else that comes close to a violation of any social media platform's "community standards."  (FAC ¶¶ 39, 41.)

On the morning of May 5, 2024, Meta admitted in a statement to the New York Times that it was censoring *Who Is Bobby Kennedy*. (FAC ¶ 43.)  But Meta claimed that this was the result of a "mistaken" determination that the film was "spam," that the "mistake" had been corrected, and that the film was no longer being censored. (*Id.*)

These claims too were false. To begin with, Defendants did ***not*** stop censoring *Who Is Bobby Kennedy*; they continued to censor it after May 5, and they are shadow-banning it even now.[7] Moreover, the notion that *Who Is Bobby Kennedy* was being accidentally censored because it was mistaken for "spam" is implausible on its face: "spam" refers to in-bulk

---

[7] Both before and after May 5, Facebook and Instagram users were hit with account suspensions for trying to share or link to *Who Is Bobby Kennedy*. To give just one of many examples, on May 7, a Kennedy supporter located in California sought to post a link to *Who Is Bobby Kennedy* on both Instagram and Facebook, but was blocked from doing so. Rasmussen Ex. A at 11-12. When he continued trying to share the film through his Facebook page, he received a message from Facebook stating that his account had been placed under a 24-hour suspension during which he would not be able to post any further content on it. *Id.* at 12; FAC ¶ 47. Even now, Meta is continuing to shadow-ban the film, for example by preventing links to the film from appearing on users' timelines or feeds, techniques through which Meta deliberately but surreptitiously reduces the dissemination of content. At the same time, Meta has continued to send messages to users falsely stating that the film is "spam" or contains "sexual" or "violent" content. Rasmussen Ex. A at 8, 10; Rasmussen Ex. B at 1, 4, 6-8, 10, 12-21.

dissemination of messages, especially commercial messages, to large numbers of recipients, whereas Defendants were censoring individual users from merely posting a link on their own pages to a website displaying a political film. In addition, Meta's claim that it had mistaken *Who Is Bobby Kennedy* for "spam" is contradicted by: a) the numerous messages users received from Meta offering other, equally bogus explanations; and (b) the fact that Defendants are now brazenly censoring messages merely expressing support for Mr. Kennedy, establishing that Defendants are systematically targeting pro-Kennedy content.

Plaintiffs filed this suit on May 13, 2024.  Even then, in addition to blocking *Who Is Bobby Kennedy*, Defendants were already censoring some pro-Kennedy speech unrelated to the film. For example, on May 8, a Meta user tried to post the following statement to her Facebook page: "RFKjr needs 180,000 signatures to get on the ballot in #Texas and time is running out. Go to kennedy24.com/events and find a petition signing event near you." She received the following message: "We removed your comment." And she was warned that "[r]epeatedly breaking our rules can cause more account restrictions."  (FAC ¶ 59; Rasmussen Ex. A at 14.)

Since the filing of this suit, however, Defendants' censorship of pro-Kennedy speech has radically intensified. (FAC ¶ 60.)  In the past 60 days, the Kennedy Campaign has received reports from over 200 individual Facebook and/or Instagram users who have been prevented from sharing links to www.kennedy24.com, censored for posting pro-Kennedy content, threatened with account suspensions or terminations for posting such content, and/or have suffered suspensions or terminations based upon their support or advocacy of Mr. Kennedy. (FAC ¶ 61; Rasmussen Dec. ¶¶ 15-23 and Rasmussen Exs. B, C.)

The pro-Kennedy content being censored on Facebook and Instagram does not violate any Meta terms of service or "community standards." (FAC ¶ 62.)  On the contrary, the content

now being blocked includes bare expressions of support for Mr. Kennedy, such as "Kennedy all the way!" "VOTE KENNEDY," "Time to add Kennedy to the mix," or "checkout Kennedy's policy page on his website." (FAC ¶ 63; Rasmussen Ex. B at 2-4, 15-16.)

Nor can there be any claim that Defendants were enforcing their "community standards" when Facebook and Instagram users were prevented from: sharing links to "The Real Debate" (an online debate event described *supra*); sharing links to a petition for the inclusion of Kennedy in the presidential debates; posting the hashtags #letbobbydebate and #boycottCNN; and sharing links to news coverage of a RFK, Jr. Debate Rally in Miami, Florida. (FAC ¶ 64; Rasmussen Ex. B at 2-3, 7-8, 11.) Defendants even blocked private messages between users with links to "RFK, Jr.", making them unavailable on Instagram. (FAC ¶ 66; Rasmussen Ex. B. at 9, 20, 24.) And with respect to all the censored content just described, Defendants sent threats to users warning them that further attempts to post the censored content would result in account restrictions, suspensions, and/or terminations. (FAC ¶ 65.)

Almost comically, Meta is deploying its AI ChatBot to deflect simple queries about whether Mr. Kennedy is running for President with erroneous, deceitful responses such as "Robert F Kennedy, Jr. has not announced his candidacy for president" and "As for the current political landscape, there are no Kennedys currently running for president in the 2024 elections." (FAC ¶ 68; Rasmussen Ex. B. at 22-23.) In addition, Defendants are removing posts that share a link to www.kennedydebunked.com, a website offering refutations of false statements made about Mr. Kennedy. (FAC ¶ 67.)

Finally, adding obstruction to injury, Defendants are now blocking links to a dedicated off-platform website, www.kennedycensored.com, where social media users are invited to report

and submit evidence of their own experience of being censored for posting pro-Kennedy content. (FAC ¶ 69; Rasmussen Dec. at 2-3.)

One illustration of the intimidating censorship of pro-Kennedy content faced by users of Meta's platforms is provided by Plaintiff Jessica Reed Kraus, an independent journalist with an Instagram following of 1.2 million and more than 330,000 paid subscribers to her Substack blog, @HouseInhabit. Covering politics and popular culture with behind-the-scenes insights, Ms. Reed Kraus monetizes her work by posting free content on Instagram that draws subscribers to her paid Substack account. Since October 2023, she has invested significant time following candidates Trump and Kennedy on the campaign trail.  Her Instagram account has been widely censored and demoted for her coverage of Mr. Kennedy, but not for her coverage of President Trump. (FAC ¶¶ 70-72; Declaration of Jessica Reed Kraus (hereafter "Reed Kraus Dec.") at 3.)

Last October, Ms. Reed Kraus wrote on Instagram about Kennedy's "divorce" from the Democrats, and her account lost 40,000 followers overnight.  (FAC ¶ 73; Reed Kraus Dec. at 3.) Surreptitious "demoting" or "de-boosting" of her account by Defendants is the only explanation for such an immediate, drastic change. In November, 2023, after a month of covering Kennedy regularly in her daily Instagram feed, her story views plummeted—again, an unprecedented event explainable only by the fact that Defendants were "shadow-banning" her content (i.e., reducing its dissemination and reach). (Reed Kraus Dec. at 5.) Her posts supporting Mr. Kennedy were flagged with "COVID-19 misinformation" warnings, and her account was restricted from being shown to non-followers—a critically damaging restriction, because it prevented her from recruiting new subscribers. (FAC ¶¶ 74-77; Reed Kraus Dec. at 3-5.)

On May 3, 2024, Ms. Reed Kraus was given an exclusive opportunity to launch *Who is Bobby Kennedy* online. Within minutes of posting excerpts on Instagram, she was locked out of

the account, and her account was again disabled from being shared with new followers or being recommended-to-follow. Her Instagram Story views shrank from 200,000 to 60,000 per day. Since May 3, she has tried to post other comments about Kennedy's campaign with similar threats and restrictions. Before the June 27 debate, she posted to Instagram a poll in which 90% of the 300,000 respondents said that Kennedy should be allowed to debate. Within minutes, Instagram blocked this post as "inappropriate" because it "violates our community standards" and warned Ms. Reed Kraus that further such posts would lead to account restriction or termination. (FAC ¶¶ 78-81; Reed Kraus Dec. at 4-5.)

As a result of Defendants' actions, Ms. Reed Kraus has been put in fear of posting additional content online supporting or advocating for Mr. Kennedy or urging others to vote for him. Moreover, Defendants' restrictions have prevented new followers from seeing her posts, eliminating potential new subscribers to her Substack and causing monetary loss. (FAC ¶¶ 85-86; Reed Kraus Dec. ¶¶ 1, 5-14.)

As will be shown below, Defendants' censorship and intimidation of users who post pro-Kennedy content is in violation of the Voting Rights Act, of the Support or Advocacy Clauses of Section 1985(3), and—because it is the result of years-long collusion with the federal government—the First Amendment.

## ARGUMENT

## I.   PRELIMINARY INJUNCTION STANDARD OF REVIEW.

In the Ninth Circuit, plaintiffs are entitled to a preliminary injunction if they establish: (1) "serious questions going to the merits," (2) "a balance of hardships that tips sharply towards [them]," (3) "a likelihood of irreparable injury," and (4) that "the injunction is in the public interest." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir.

2024) (citation omitted). "[T]he serious questions standard is 'a lesser showing than likelihood of success on the merits.'" *Id*. (quoting *Alliance for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017)). Plaintiffs are also entitled to a TRO or preliminary injunction if they establish: (1) a likelihood of success on the merits; (2) irreparable harm; (3) a favorable balance of equities; and (4) that an injunction will be in the public interest.  *Id*.  All the above-listed factors, from both tests, are satisfied here.

## II.   PLAINTIFFS HAVE ESTABLISHED A LIKELIHOOD OF SUCCESS ON THE MERITS OR, AT A MINIMUM, HAVE ESTABLISHED SERIOUS QUESTIONS GOING TO THE MERITS.

### A.   Plaintiffs' Voting Rights Act Claim is Likely to Succeed on the Merits

Section 11(b) of the Voting Rights Act of 1965 forbids anyone, "whether acting under color of law or otherwise," to "intimidate, threaten, or coerce any person for urging . . . any person to vote." 52 U.S.C. § 10307(b). That is exactly what Defendants have done here.

#### 1. *Section 11(b) overview*

"Despite limited case law on the provision, the relevant text, history, and precedent confirm" certain "bedrock principles of Section 11(b)." STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA, Jan. 23, 2023, at 1, ECF No. 74 in *Colorado State Area Conference of the NAACP v. United States Election Integrity Plan*, No. 1:22-cv-581-CNS-NRN (D. Colo.) (hereafter "STATEMENT OF THE UNITED STATES") (attached hereto). Among those bedrock principles are the following:

*First*, "Section 11(b) 'is to be given an expansive meaning.'" *Id*. at 3 (quoting *Jackson v. Riddell*, 476 F. Supp. 849, 859 (S.D. Miss. 1979)); *see also, e.g.*, *League of United Latin Am. Citizens v. Pub. Int. Legal Found.*, No. 18-cv-423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (referring to "[Section] 11(b)'s deliberately unqualified reach").

1

2      *Second*, "[p]rivate plaintiffs may bring suit to enforce Section 11(b)." STATEMENT OF THE

3    UNITED STATES, *supra*, at 7 (collecting numerous authorities); *see also, e.g.*, *Krabach v. King*

4    *Cnty*, No. 2:22-cv-1252-BJR, 2023 U.S. Dist. LEXIS 191870, at *7-8 (W.D. Wash. Oct. 25,

5    2023) (recognizing private right of action under Section 11(b) and collecting authorities).

6      *Third*, Section 11(b) "comprehensively" protects voting. STATEMENT OF THE UNITED

7    STATES, *supra*, at 1. The provision "protects not just voting but voting-related conduct, which

8    includes encouraging others to vote" for a particular party or candidate months before an

9    election, for example through a voter registration drive. *Allen v. City of Graham*, No. 20-cv-997,

10    2021 WL 2223772, at *24 (M.D.N.C. June 2, 2021); *Nat'l Coalition on Black Civic*

11    *Participation v. Wohl*, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020) (hereafter *Wohl*) (same).

12      *Fourth*, "the provision **does not require proof of subjective intent** to intimidate, threaten,

13    or coerce." STATEMENT OF THE UNITED STATES, *supra*, at 3, 5-6 (quoting legislative history)

14    (emphasis added); *Ariz. Alliance for Retired Americans. v. Clean Elections USA*, 638 F. Supp. 3d

15    1033, 1041 (D. Ariz. 2022) (Section 11(b) violated "regardless of whether defendants acted with

16    the specific intent of intimidating or threatening voters."); *League of United Latin Am. Citizens*,

17    2018 WL 3848404, at *4 (no "showing of specific intent . . . is required under [Section] 11(b).");

18    *Wohl*, 498 F. Supp. 3d at 480 ("no explicit requirement of intent" in the provision); *Daschle v.*

19    *Thune*, No. 04-cv5 Case 1:22-cv-00581-CNS-NRN, ECF No. 6 (D.S.D. Nov. 2, 2004) (granting

20    temporary restraining order and holding that "[w]hether the intimidation was intended or simply

21    the result of excessive zeal is not the issue, as the result was the intimidation of prospective …

22    voters").

23      *Finally*, as a result, "the crux of a Section 11(b) claim is whether the conduct at issue was

24    *objectively* intimidating, threatening, or coercive." STATEMENT OF THE UNITED STATES, *supra*, at

25

26                                  11

6 (original emphasis). Thus where (as here) a defendant has sent warning messages to individuals engaged in activity that Section 11(b) protects (such as urging others to vote for a particular candidate), the test is whether, regardless of subjective intent, defendant sent "messages that a reasonable recipient familiar with the context of the message would interpret as a threat of injury tending to deter individuals" from engaging in the protected activity. *Krabach*, 2023 U.S. Dist. LEXIS 191870, at *17 (quoting *Wohl*, 498 F. Supp. 3d at 476).

### 2. *Defendants are violating Section 11(b).*

Under these precedents, and by the clear terms of the statute, Defendants are plainly violating Section 11(b) on a massive scale: Plaintiffs, together with countless other Facebook and Instagram users, were urging people to vote, and Defendants responded thereto with threats, intimidation, and coercion.

To "urge" is to "advocate" or to "try to persuade," *see* Merriam-Webster, Definition of Urge, https://www.merriam-webster.com/dictionary/urge, and "urging" can of course be implicit as well as explicit.[8] By releasing *Who Is Bobby Kennedy*, Plaintiff AV24 was "advocating" for Mr. Kennedy's candidacy and "try[ing] to persuade" people to vote for him. (FAC ¶ 104.) Through his own speech in that film, Plaintiff Kennedy was urging Americans to vote for him. When attempting to launch that film on Instagram, Plaintiff Reed Kraus was implicitly urging others to vote for Mr. Kennedy, as were countless other Kennedy supporters who were prevented from posting links to the film on Facebook and Instagram. (FAC ¶ 104; Reed Kraus Dec. at ¶ 13;

---

[8]  *See, e.g.*, *United States v. Farias-Contreras*, 104 F.4th 22, 2024 U.S. App. LEXIS 13231, at *5 (9th Cir. June 3, 2024) (en banc) ("government *implicitly urged* the district court to impose a harsher sentence") (emphasis added); *United States v. Palomino*, 599 F. Appx. 638, 639 (9th Cir. 2015) ("Under these circumstances, the prosecutor's repeated and exclusive emphasis on aggravating factors . . . *implicitly urged* a higher sentence.") (emphasis added).

Rasmussen Ex. A at 1-12.) And when she posted the pro-Kennedy content that led to her account restrictions, Ms. Reed Kraus, along with countless other Facebook and Instagram users, was again encouraging others to vote for him. (FAC ¶ 105; Reed Kraus Dec. at ¶ 13; Ex. C.)

Nor can there be any doubt that Defendants responded to such urging with "threat[s]," "intimidat[ion]," and "coerc[ion]." 52 U.S.C. § 10307(b). First, threats: Defendants repeatedly sent messages that would reasonably have been understood as, and were understood as, warnings that users' accounts would be suspended if they continued urging people to vote for Mr. Kennedy. (Reed Kraus Dec, at ¶¶ 13-14.)  Because social media accounts are the property of the user,[9] and because the content in question was not in violation of any Meta terms of service, Defendants were threatening users with substantial harm to their property. *See United States v. Taylor*, 596 U.S. 845, 854-55 (2022). ("[T]he word 'threat' and its cognates usually denote '[a] communicated intent to inflict physical or other harm on any person or on property.'").

Next, intimidation: to "intimidate" is to "to make timid or fearful: inspire or affect with fear." *United States v. Bibbins*, 637 F.3d 1087, 1092 (9th Cir. 2011) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1184 (1993 ed.)); *Wohl*, 498 F. Supp. 3d at 477 (so interpreting the word "intimidate" in Section 11(b)). Defendants' warnings and especially their account suspensions objectively did just that. These suspensions would have made reasonable

---

[9]  *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 995 (9th Cir. 2019) ("users retain ownership" over their social media accounts and content "contributed by" them); *Erisat-Eritrean Satellite TV v. Gebrekidan*, No. CV 24-1121-DMG, 2024 U.S. Dist. LEXIS 55623, at *2 (C.D. Cal. Mar. 5, 2024) (referring to "social media accounts" as "property" of user); *Viera v. Gen. Auto. Ins. Servs. & Permanent Assur. Corp.*, No. 3:19-cv-00901, 2021 U.S. Dist. LEXIS 21424, at *62 (M.D. Tenn. Feb. 4, 2021) ((holding and collecting "authority that social media accounts are property interests"); *Salonclick LLC v. SuperEgo Mgmt. LLC*, No. 16 Civ. 2555 (KMW), 2017 U.S. Dist. LEXIS 6871, at *10 (S.D.N.Y. Jan. 18, 2017) ("social media accounts" are property).

people frightened that if they continued encouraging people to vote for Mr. Kennedy, their accounts would be frozen or permanently terminated, cutting them off from the modern public square and in some cases causing substantial economic loss. That is exactly the effect Defendants' actions and threats had on Ms. Reed Kraus, who lost followers and revenue due to Defendants' censorship and has now become afraid to post pro-Kennedy content. (FAC ¶ 85; Reed Kraus Dec. ¶ 14.)

Moreover, the term "intimidation" in voting-rights statutes also includes disseminating "false utterances" intended to chill, or having the effect of chilling, individuals from engaging in the protected activity. *See, e.g.*, *United States v. Mackey*, No. 21-CR-80 (AMD)**,** 2023 U.S. Dist. LEXIS 186646, at *65-66 (E.D.N.Y. Oct. 17, 2023) (upholding conviction for disseminating false information online intended to trick people into not voting, and holding that the words "injure, oppress, threaten, or intimidate" in 18 U.S.C. § 241 encompass not only "violence," but also "false utterances" deterring individuals from engaging in protected voting-related conduct). Here, Defendants disseminated wild falsehoods about *Who Is Bobby Kennedy*, which would have caused (and did cause) reasonable users to stop trying to share it.

Lastly, Defendants are "coerc[ing]" users by blocking and shadow-banning their content. To "coerce" is to "compel by force," and the force used need not be "violent" or physical. *United States v. Elliott*, 835 F. Appx. 78, 82 (6th Cir. 2020) (quoting BLACK'S LAW DICTIONARY 315 (10th ed. 2014)). To be sure, a platform's content moderation is not coercive when it simply enforces a platform's agreed-upon terms of service.  Here, however, the censored content was and is entirely consistent with Defendants' terms of service. When Defendants block pro-Kennedy content, in violation of their own terms of service, they are literally coercing users— compelling them by mechanical force—to stop urging others to vote.

For all these reasons, Plaintiffs have established a likelihood of success on—or at the very least serious questions going to the merits of—their claim that Defendants are repeatedly violating Section 11(b) of the Voting Rights Act by responding with threats, intimidation, and coercion when users, including Plaintiffs, urge other persons to vote for Mr. Kennedy.

**B.     Plaintiffs' Civil Rights Act Claims Are Likely to Succeed on the Merits**

1.   *Sections 1985(3) and 1986 overview*.

Section 1985(3) contains two independent and legally distinct sets of prohibitions (now joined together in one statutory section as a result of various recodifications). The Equal Privileges Clauses (not at issue here), which prohibit deprivation of "equal protection" rights or other "equal privileges and immunities," 42 U.S.C. § 1985(3), protect only against violations of the Constitution's equal protection guarantee, and hence a claim under these clauses must allege state action and race- or class-based misconduct. *See, e.g.*, *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68, 278 (1993).

The Support or Advocacy Clauses of Section 1985(3) are entirely different. Originally enacted as part of the Ku Klux Klan Act of 1871 (also referred to as the Civil Rights Act of 1871), these Clauses prohibit two different kinds of conspiracies:

> (1) conspiracies "to injure any citizen in person or property on account of" such citizen's "giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President," ***and/or***

> (2) conspiracies to "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President."

42 U.S.C. § 1985(3). With respect to both such conspiracies, Section 1985(3) gives a cause of action to any person (voter or otherwise) "injured in his person or property" as a result of "any act in furtherance" of the conspiracy. Although the statute refers to money damages, it is well

15

established that Section 1985(3) plaintiffs may seek injunctive relief as well. *See, e.g.*, *McAlister v. Alaska*, No. 3:23-cv-0029-HRH, 2023 U.S. Dist. LEXIS 85067, at *21 (D. Alaska May 16, 2023) (so holding and collecting cases).  In addition, under Section 1986, any person who knows that a Section 1985(3) "wrong" is "about to be committed," and who has the power "to prevent or aid in preventing the commission thereof," is subject to suit if he "neglects or refuses to do so." 42 U.S.C. § 1986.

By contrast to the Equal Privileges Clauses, the Support or Advocacy Clauses do ***not*** protect only against constitutional violations, do ***not*** apply only to racial or class-based misconduct, and do ***not*** require state action or the involvement of government officials.  *See, e.g.*, *Kush v. Rutledge*, 460 U.S. 719, 724-25 (1983) (distinguishing Section 1985's Support or Advocacy clauses and stating that they "contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws"); *Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1269 n.21 (8th Cir. 1990) ("support or advocacy" clause not "subject to the racial or other invidious discrimination requirement applicable to equal protection claims"); *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) ("support or advocacy" clause provides "protect[ion] from individual as well as from State interference"); *Cervini v. Cisneros*, 593 F. Supp. 3d 530, 539 (W.D. Tex. 2023) ("Support or Advocacy" clauses create independent rights and do not require state action).

The Support or Advocacy Clauses apply to and protect support or advocacy of a presidential candidate, not merely a presidential elector. *See, e.g.*, *Kush*, 460 U.S. at 724 (Section 1985(3) protects "right to support candidates in federal elections"); *Cervini*, 593 F. Supp. 3d at 532, 539 (recognizing cause of action under Support or Advocacy Clause where defendants

allegedly harassed individuals riding in a Biden-Harris campaign tour bus). or Advocacy Clauses protect "support or advocacy of candidates in federal elections.").

Here, Defendants engaged in both kinds of conspiracy prohibited by the Support or Advocacy Clauses: Defendants conspired to injure citizens on account of their support or advocacy of Mr. Kennedy; and they conspired to prevent such support or advocacy by threat, intimidation, and coercion.

2. *Defendants have conspired to injure citizens on account of their support or advocacy for Mr. Kennedy.*

A defendant violates the Support or Advocacy Clauses if he conspires with another person to injure any "citizen in person or property on account of" such citizen's "giving his support or advocacy in a legal manner, toward or in favor of" a presidential candidate. 42 U.S.C. § 1985(3). All these elements are fully established here.

A conspiracy for purposes of Section 1985(3) is an agreement or "tacit understanding" between two or more persons "to carry out the prohibited conduct." *Wohl*, 498 F. Supp. 3d at 487 (quoting *Cine Sk8, Inc. v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007)). Importantly, as this Court influentially held years ago, the intra-corporate conspiracy doctrine—an antitrust rule under which a corporation, its subsidiaries, and/or its employees cannot conspire with one another—does ***not*** apply to suits under Section 1985. *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323, 1326 (N.D. Cal. 1988) (Orrick, J.), *followed by, e.g.*, *Rashdan v. Geissberger*, No. 10-00634 SBA, 2011 U.S. Dist. LEXIS 4792, at *19 (N.D. Cal. Jan. 14, 2011); *O. H. v. Oakland Unified Sch. Dist.*, No. C-99-5123 JCS, 2000 U.S. Dist. LEXIS 21725, at *13-27 (N.D. Cal. Apr. 17, 2000). Thus agreements among a corporation's employees, or among a corporation and its subsidiaries, or between a corporation and its employees, or between a

17

corporation's Chief Executive Officer and its employees, satisfy the conspiracy requirement of Section 1985. *See Washington*, 696 F. Supp. at 1327 ("agreements . . . between a business and its employees threaten exactly the group danger at which conspiracy liability is aimed by the enactment of §§ 1985(3) and 1986").

Accordingly, it cannot be seriously disputed that Section 1985's conspiracy requirement is satisfied here, because Defendants are conspiring *with and among each other*.  (FAC ¶¶ 119-26.) It would strain credulity beyond the breaking point to suppose that Facebook and Instagram, which are under the common control of Defendants Meta and Zuckerberg, are by pure *coincidence* both censoring the same pro-Kennedy content that does not violate either platform's terms of service. Facebook and Instagram each use human review teams to make significant "content moderation" decisions, and particularly important matters (or matters concerning political figures) are elevated to more senior corporate officers. (FAC ¶¶ 121-23.)  Plainly the two corporations' review teams, along with their responsible officers, and/or Meta and Meta's responsible officers are acting in concert with one another. (Meta's responsible officers, including Defendant Zuckerberg, are well aware of Meta's involvement and controversial content moderation in past elections and must certainly be exercising oversight of the company's content moderation in this election. (FAC ¶ 124.))  Even if there were no cross-corporate agreement, at a bare minimum an agreement and therefore a Section 1985 conspiracy would still exist within **each** of Facebook and Instagram. *See Washington*, 696 F. Supp. at 1327 (agreement "between a business and its employees" satisfies Section 1985 conspiracy requirement).

This conspiracy is a clear violation of Section 1985(3) because it is nothing other than an agreement to inflict injury on innumerable users, including innumerable citizens, who support or advocate for Mr. Kennedy. An "injury" to "person or property" for Section 1985(3) purposes

"does not need to be one of violence or bodily harm; rather, 'economic harm, legal action," and intangible invasions of protected interests "can qualify depending on the circumstances.'" *Krabach*, 2023 U.S. Dist. LEXIS 191870, at \*17 (quoting *Wohl*, 498 F. Supp. 3d at 477). As stated above, controlling precedent establishes that a social media account is the user's property,[10] and hence unlawful suspensions of those accounts—where the suspension is not justified under the platform's own terms of service—constitute harm to property.

Thus Plaintiffs are likely to succeed on—or at the very least have raised serious questions going to the merits of—their claim that Defendants are violating Section 1985(3) by conspiring to injure citizens in their person or property on account of their lawful support and advocacy for a presidential candidate.

>   3.  <u>Defendants have conspired to prevent citizens by force, intimidation, or threat from giving their support or advocacy to Mr. Kennedy.</u>

For the reasons given above, Defendants further violated Section 1985(3) by conspiring to "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" to a presidential candidate. 42 U.S.C. § 1985(3).

First, as shown immediately above, under this Court's decision in *Washington v. Duty Free Shoppers* (and numerous other precedents), Defendants' intra-corporate agreement (their agreement among themselves) to censor pro-Kennedy content constitutes a conspiracy for Section 1985 purposes.  Second, just as Defendants' conduct constitutes intimidation, threat, and coercion under Section 11(b) of the Voting Rights Act, *see supra* Point II(A)(2), so too it necessarily constitutes "force, intimidation, or threat" under Section 1985(3) of the Civil Rights

---

[10] *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 995 (9th Cir. 2019) ("users retain ownership" over their social media accounts and content "contributed by" them).

Act. *See, e.g.*, *Wohl*, 498 F. Supp. 3d at 487 (terms "intimidation" and "threat" have same meaning in both Section 11(b) of the Voting Rights Act and the Support or Advocacy Clauses of Section 1985(3)).  Finally, because Defendants are deliberately seeking to block and suppress pro-Kennedy content, the manifest object of Defendants' conspiracy was to "prevent" Facebook and Instagram users, including citizens, from expressing their support and advocacy of a presidential candidate, thereby violating Section 1985(3).

       4.  *Plaintiffs have Section 1985(3) standing to sue*.

As stated above, Section 1985(3) confers standing to sue on "any person injured in person or property" by any acts taken in "furtherance" of any conspiracy prohibited by that section.  42 U.S.C. § 1985(3). Under the clear statutory language, "any person" so injured may sue; i.e., standing to enforce the Support or Advocacy Clauses of Section 1985(3) is not limited to voters or to those whose support and advocacy was suppressed. *Id*. Although only one plaintiff need have standing, *see Biden v. Nebraska*, 600 U.S. 477, 489 (2023) ("If at least one plaintiff has standing, the suit may proceed."), each Plaintiff here has suffered the requisite injury.

Plaintiff AV24, which owns and spent approximately one million dollars producing *Who Is Bobby Kennedy*, has suffered an injury to reputation and property by and as a result of Defendants' countless acts of suppressing and falsely defaming that film, which reduced its value, its effectiveness, and the donation revenue drawn therefrom. (FAC ¶ 133.)  Moreover, Plaintiff Kennedy has suffered both personal injury (reputational harm and damage to his presidential campaign) and economic injury (loss of donation revenue). *See, e.g.*, *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 624, 626 (2nd Cir. 1989) (holding that candidate's exclusion from televised debate constituted "personal injury" for standing purposes and asking, "In this era of modern telecommunications, who could doubt the powerful beneficial

effect that mass media exposure can have today on the candidacy of a significant aspirant seeking national political office?"). Finally, Plaintiff Reed Kraus suffered injury to property when her Instagram account (which is her property) was restricted, and she suffered significant economic harm when Defendants' acts caused a dramatic loss of followers, reducing her Substack audience and revenue. (Reed Kraus Dec. at ¶ 7.)  Thus all Plaintiffs have standing to sue under Section 1985(3).

**C.    Plaintiffs' Have At Least Established Serious Questions Going to the Merits of their First Amendment Claims.**

In *Missouri v. Biden*, based on a copiously documented evidentiary record, the United States District Court for the Western Court of Louisiana and the United States Court of Appeals for Fifth Circuit found that the federal government has for years been violating the First Amendment by pressuring and working jointly with social media platforms to censor protected speech. *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023), *aff'd*, 83 F.4th 350 (5th Cir. 2023), *rev'd on standing grounds sub nom. Murthy v. Missouri*, No. 23-411, 2024 U.S. LEXIS 2842 (U.S. June 26, 2024).

Defendant Meta has been a principal participant in this censorship campaign. As the District Court found, Meta has acted as a "partner" with the White House, censoring individuals and factual material identified by the Government as objectionable, in order "to drive behavior." *See, e.g.*, *Missouri v Biden*, 680 F. Supp. 3d at 647 ("Meta also stated [in email communications with the White House], 'We think there is considerably more we can do in "*partnership*" with you and your team to drive behavior.'") (emphasis by the Court)). And as the District Court also found, on the basis of internal emails and other documents, the Meta-governmental partnership aggressively, specifically, and repeatedly targeted Mr. Kennedy for censorship. *See, e.g.*,

*Kennedy v. Biden*, 2024 U.S. Dist. LEXIS 26751 at *13-14; *see also* FAC at 26-27 (summarizing congressional findings detailing Mr. Kennedy's de-platforming from Instagram under pressure from, and in "collusion" with, the federal government).

Internal Meta communications admit that, in its speech-suppression partnership with the Government, Meta's platforms do not merely block so-called "misinformation." On the contrary, "Facebook noted [in internal emails] that in response to White House demands, it was censoring, removing, and reducing the virality of content discouraging vaccines 'that does not contain actionable misinformation.'" *Missouri v. Biden*, 680 F. Supp. 3d at 648. Weighing all the evidence together, the District Court described the government-platform censorship campaign as "arguably the most massive attack against free speech in United States history." *Id*. at 641. And the Court specifically found that the platforms' censorship of Mr. Kennedy was the result of joint action with, and coercive pressure from, the federal government, so that this censorship was state action and a violation of the First Amendment. *Kennedy v. Biden*, 2024 U.S. Dist. LEXIS 26751 at *22-23, 25.

While federal courts do not take judicial notice of other courts' findings, the holdings handed down in these cases, together with the voluminous evidentiary record on which the courts relied, demonstrate that Plaintiffs have at a bare minimum raised "serious questions going to the merits" of their First Amendment claim—which is all Plaintiffs need do on this preliminary injunction motion. *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190; *Alliance for the Wild Rockies*, 865 F.3d at 1217.

## III.   AS A MATTER OF LAW, IRREPARABLE HARM, THE EQUITIES, AND THE PUBLIC INTEREST ALL SHARPLY FAVOR PLAINTIFFS

As a matter of law, all the other preliminary injunction factors—irreparable harm, the

balance of equities, and the public interest—sharply favor Plaintiffs. *See, e.g.*, *CTIA v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) (a "party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury . . . by demonstrating the existence of a colorable First Amendment claim"); *American Bev. Ass'n v. City & County of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (the "fact that [Plaintiffs'] have raised serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [their] favor"); *id*. ("'it is always in the public interest to prevent the violation of a party's constitutional rights'") (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). By contrast, Defendants have no legitimate interests whatsoever in continuing to censor core political speech—not in violation of any Meta terms of service—favoring a candidate in the upcoming presidential election.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to issue an order enjoining Defendants to cease and desist their censorship (including both removal and shadow-banning) of support for, advocacy of, and other speech encouraging or urging people to vote for, Mr. Kennedy.


Respectfully Submitted,

DATED: July 23, 2024



_____
                    *-s-*
ROGER I. TEICH
California State Bar No. 147076
337 Liberty Street
San Francisco, CA 94114

1

2  Telephone: (415) 948-0045
   E-mail: rteich@juno.com
3  Attorney for Plaintiff AV24

4

5  _____-s-_____

6  JED RUBENFELD
   NY Bar # 2214104
7  1031 Forest Rd.
   New Haven, CT 06515
8  Telephone: (203) 432-7631
   E-mail: jed.rubenfeld@yale.edu
9  Attorney for Plaintiffs American Values 2024
   and Jessica Reed Kraus

10

11 _____-s-_____

12 RICHARD JAFFE, ESQ.
   California State Bar No. 289362
13 428 J Street, 4th Floor
   Sacramento, California 95814
14 Tel: 916-492-6038
   Email: rickjaffeesquire@gmail.com
15 Attorney for Plaintiffs Robert F. Kennedy, Jr. and Jessica Reed Kraus

16

17

18

19

20

21

22

23

24

25

26