SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000
Facsimile: (650) 858-6100

KYLE T. EDWARDS (SBN 323952)
 Kyle.Edwards@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
Telephone: (628) 235-1061
Facsimile: (202) 235-1001

*Attorneys for Defendants*
META PLATFORMS, INC., FACEBOOK
OPERATIONS, LLC, INSTAGRAM, LLC, and
MARK ZUCKERBERG

ARI HOLTZBLATT (SBN 354361)
 Ari.Holtzblatt@wilmerhale.com
ALLISON M. SCHULTZ (*pro hac vice*)
Allison.Schultz@wilmerhale.com
NATHANIEL W. REISINGER (*pro hac vice*)
 Nathaniel.Reisinger@wilmerhale.com
WILMER CUTLER PICKERING
 HALE AND DORR LLP
2100 Pennsylvania Ave, NW
Washington, DC 20037
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| ROBERT F. KENNEDY, JR., AMERICAN VALUES 2024,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., ET AL.,<br><br>Defendants. | Case No. 3:24-cv-02869-WHO<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hon. William H. Orrick<br>Courtroom 02, 17th Floor<br>Date:  August 28, 2024<br>Time:  2:00 PM |

1

**TABLE OF CONTENTS**

2  STATEMENT OF FACTS ...........................................................................................3

3      A.    Meta's Facebook And Instagram Services ........................................... 3

4      B.    The Alleged Content At Issue Here ..................................................... 5

5      C.    Allegations Regarding Meta's Interactions With The Government ....................... 7

6      D.    This Litigation.......................................................................... 7

7  STANDARD OF REVIEW ..........................................................................................8

8  ARGUMENT ...........................................................................................................8

    I.    Plaintiffs' Requested Injunction Is Barred By The First Amendment..............................8

9  II.    Plaintiffs' First Amendment Claim Cannot Support A Preliminary Injunction ...............10

10     A.    Plaintiffs' First Amendment Claim Fails ............................................. 11

11     B.    Plaintiffs' Perfunctory Recitation Of The Remaining Winter Factors Is

12             Insufficient ........................................................................ 14

13 III.   Plaintiffs Fail To Advance An Argument For Equitable Relief On Their Statutory Claims,

14     Which Are, In Any Event, Meritless And Barred By Section 230. ..................................16

    A.    Plaintiffs' VRA Section 11(b) Claim Fails ........................................... 16

15

16     B.    Plaintiffs' Section 1985(3) Claim Fails ............................................... 19

17     C.    Section 230 Independently Bars Plaintiffs' Statutory Claims ............................ 23

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

*Altman v. County of Santa Clara*,
    464 F. Supp. 3d 1106 (N.D. Cal. 2020) ........................................................16

4

*Arizona Alliance for Retired Americans v. Clean Elections U.S.*,
    638 F. Supp. 3d 1033 (D. Ariz. 2022) ..........................................................17

5

6

*Associates & Aldrich Co. v. Times Mirror Co.*,
    440 F.2d 133 (9th Cir. 1971) .............................................................10, 15

7

8

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ..........................................................24, 25

9

*Bowie v. Maddox*,
    642 F.3d 1122 (D.C. Cir. 2011) .............................................................21

10

11

*Canlis v. San Joaquin Sheriff's Posse Comitatus*,
    641 F.2d 711 (9th Cir. 1981) ...............................................................19

12

*Carafano v. Metrosplash.com, Inc.*,
    339 F.3d 1119 (9th Cir. 2003) ..............................................................24

13

14

*Carlin Communications, Inc. v. Mountain States Telephone and Telegraph Co.*,
    827 F.2d 1291 (9th Cir. 1987) ..............................................................10

15

16

*Children's Health Defense v. Facebook, Inc.*,
    546 F. Supp. 3d 909 (N.D. Cal. 2021) ...................................................4, 5

17

*City of Sausalito v. O'Neill*,
    386 F.3d 1186 (9th Cir. 2004) ..............................................................23

18

19

*Collins v. Womancare*,
    878 F.2d 1145 (9th Cir. 1989) ..............................................................12

20

21

*Counterman v. Colorado*,
    600 U.S. 66 (2023).........................................................................17, 19

22

*CTIA – The Wireless Ass'n v. Berkeley, California*,
    928 F.3d 832 (9th Cir. 2019) ................................................................14

23

24

*Dangaard v. Instagram, LLC*,
    2022 WL 17342198 (N.D. Cal. Nov. 30, 2022) ........................................24

25

26

*Daschle v. Thune*,
    No. 04-CV-4177 (D.S.D. Nov. 2, 2004)...................................................17

27

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ..................................................................8

28

*Doe I v. Google LLC*,
   2023 WL 6882766 (N.D. Cal. Oct. 18, 2023) ..............................................................8, 15

*Enigma Software Group USA, LLC v. Malwarebytes, Inc.*,
   946 F.3d 1040 (9th Cir. 2019) ...................................................................................25

*Fair Fight Inc. v. True the Vote*,
   2024 WL 24524 (N.D. Ga. Jan. 2, 2024) ...................................................................17

*Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC*,
   521 F.3d 1157 (9th Cir. 2008) ...................................................................................25

*Fyk v. Facebook, Inc.*,
   808 F. App'x 597 (9th Cir. 2020) ..............................................................................24

*Gaetz v. City of Riverside*,
   2024 WL 1269311 (C.D. Cal. Mar. 22, 2024) ...........................................................22

*Gill v. Farm Bureau Life Insurance Co. of Missouri*,
   906 F.2d 1265 (8th Cir. 1990) ..............................................................................22, 23

*Hoefer v. Fluor Daniel, Inc.*,
   92 F. Supp. 2d 1055 (C.D. Cal. 2000) ..................................................................20, 21

*Kennedy v. Biden*,
   No. 23-cv-0381 (W.D. La.) ........................................................................................10

*Kennedy v. Biden*,
   No. 24-30252 (5th Cir.) ..........................................................................................7, 14

*Kennedy v. Google LLC*,
   688 F. Supp. 3d 951 (N.D. Cal. 2023) .......................................................................15

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) .................................................................................24

*League of United Latin American Citizens - Richmond Region Council 4614 v.*
   *Public Interest Legal Foundation*, 2018 WL 3848404 (E.D. Va. Aug. 13,
   2018) ...........................................................................................................................17

*Lugar v. Edmonson Oil Co.*,
   457 U.S. 922 (1982).............................................................................................11, 12

*Madsen v. Women's Health Center, Inc.*,
   512 U.S. 753 (1994)......................................................................................................8

*Maldonado v. Morales*,
   556 F.3d 1037 (9th Cir. 2009) .................................................................................8, 9

*Manhattan Community Access Corp. v. Halleck*,
   587 U.S. 802 (2019)....................................................................................................11

*McCalden v. California Library Ass'n*,
　　955 F.2d 1214 (9th Cir. 1990) ...........................................................................20

*McLellan v. Mississippi Power & Light Co.*,
　　545 F.2d 919 (5th Cir. 1977) .............................................................................23

*Mills v. United States*,
　　742 F.3d 400 (9th Cir. 2014) .............................................................................17

*Moody v. NetChoice, LLC*,
　　144 S. Ct. 2383 (2024).............................................................1, 8, 9, 10, 19

*Murthy v. Missouri*,
　　144 S. Ct. 1972 (2024)..........................................................2, 7, 13, 14

*Murthy v. Missouri*,
　　144 S. Ct. 32 (2023)................................................................................7

*Naoko Ohno v. Yuko Yasuma*,
　　723 F.3d 984 (9th Cir. 2013) ....................................................................12, 13

*National Coalition on Black Civic Participation v. Wohl*,
　　498 F. Supp. 3d 457 (S.D.N.Y. 2020)..............................................17, 18, 23

*National Coalition on Black Civic Participation v. Wohl*,
　　661 F. Supp. 3d 78 (S.D.N.Y. 2023).........................................................17

*National Institute of Family & Life Advocates v. Becerra*,
　　585 U.S. 755 (2018)...............................................................................10

*National Rifle Ass'n v. Vullo*,
　　602 U.S. 175 (2024)..............................................................................2, 13

*O'Handley v. Weber*,
　　62 F.4th 1145 (9th Cir. 2023) .............................................1, 11, 12, 13, 21

*Portman v. County of Santa Clara*,
　　995 F.2d 898 (9th Cir. 1993) .............................................................................21

*Prager University v. Google LLC*,
　　951 F.3d 991 (9th Cir. 2020) .............................................................................11

*Sabelko v. Phoenix*,
　　120 F.3d 161 (9th Cir. 1997) ..............................................................................8

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
　　144 F. Supp. 3d 1088 (N.D. Cal. 2015) .............................................................24

*Stackla, Inc. v. Facebook Inc.*,
　　2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ............................................9, 16

*Sutton v. Providence St. Joseph Med. Ctr.*,
    192 F.3d 826 (9th Cir. 1999) ............................................................................................. 10

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) .............................................................................................................. 3

*Washington v. Duty Free Shoppers*,
    696 F. Supp. 1323 (N.D. Cal. 1988) ................................................................................. 21

*White v. Pacific Media Group, Inc.*,
    322 F. Supp. 2d 1101 (D. Haw. 2004) ............................................................................... 21

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................................. 8

*Wright v. Service Employees International Union Local 503*,
    48 F.4th 1112 (9th Cir. 2022) ........................................................................................... 12

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................................................................ 20

**RULES, REGULATIONS, STATUTES**

42 U.S.C. § 1985 ............................................................................ 2, 7, 19, 20, 21, 22, 23, 24

42 U.S.C. § 1986 ................................................................................................................ 7, 20

47 U.S.C. § 230 .................................................................................................. 3, 16, 23, 24, 25

52 U.S.C. § 10307(b) ........................................................................ 2, 8, 16, 17, 18, 19, 23, 24

**OTHER AUTHORITIES**

Facebook, *Our Mission*, https://about.fb.com/company-info./ (last visited August
    6, 2024) ................................................................................................................................. 3

Instagram, *About Us*, https://about.instagram.com/about-us (last visited August 6,
    2024) ..................................................................................................................................... 3

Plaintiffs' request for an injunction that would alter the status quo and infringe on Defendants' First Amendment rights—based on unsupported claims that will not pass muster even at the pleading stage—must be rejected.

Meta is a private entity that, through its Facebook and Instagram services, voluntarily displays and disseminates content posted by billions of users. Meta has established extensive policies regarding what content it will (or will not) disseminate on those services. Meta also organizes and recommends content to foster community and cultivate a safe, secure, and enjoyable experience for its users. It relies on both automated and human review to implement these editorial choices for the staggering amount of content posted to the services each day.

Among these editorial judgments, Meta has chosen to recommend less political content based on user feedback that such content detracts from the user experience. Meta has also chosen to prohibit certain categories of misinformation and posts containing misleading or deceptive links that put its users at risk. These and similar actions are "exactly the kind of editorial judgments … held to receive First Amendment protection." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2394 (2024). Plaintiffs' requested injunction would override these judgments by compelling Meta to disseminate third-party speech and preventing Meta from exercising its right to "remove, alter, organize, prioritize, or disclaim posts" in violation of the First Amendment. *Id.* It must be denied on that basis alone.

The motion should also independently be denied because Plaintiffs establish none—let alone all four—of the preliminary injunction factors. On three of four factors, Plaintiffs rely exclusively on their First Amendment claim, even though they admit (at 2) that claim is not the "primary issue before the Court," and claim (at 21-22) only to have raised "serious questions" about its merits. In fact, the claim fails completely. Plaintiffs rely heavily on fact findings from another litigation that the Supreme Court recently rejected as clearly erroneous. That paltry showing establishes no "meeting of the minds" between any of the Defendants and the government to violate Plaintiffs' constitutional rights, nor any threat to take adverse government action against Defendants unless they restricted Plaintiffs' specific content. It thus fails to satisfy the standards for state action established by the Ninth Circuit in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir.

2023), and confirmed by the Supreme Court in *National Rifle Ass'n v. Vullo*, 602 U.S. 175 (2024) and *Murthy v. Missouri*, 144 S. Ct. 1972 (2024). And Plaintiffs therefore fail to establish a likelihood of success—or even "serious questions"—as to the only, concededly non-primary, claim for which they even attempt to assert irreparable harm, a favorable balance of equities, or that their requested injunction serves the public interest. Here again, the Court need go no further to reject the motion.

But if more were needed, Plaintiffs' fatally deficient First Amendment claim also fails the remaining preliminary injunction factors. Plaintiffs cannot claim the irreparable harm of suppressed speech while also conceding that Plaintiffs' desired message has been widely circulated—one post viewed, for example, "one hundred million times," First Am. Compl. ("FAC") ¶ 52—in other fora and on other online services. On the flip side, the threat to Meta's own First Amendment rights from such an injunction means the balance of equities and the public interest in protecting constitutional rights and allowing Meta to police its services for abuse tip sharply in Meta's—not Plaintiffs'—favor.

As for their statutory claims, Plaintiffs address the merits but offer no showing on the three other preliminary injunction factors. The Court need not reach the merits of those claims given that default. If it does, Plaintiffs arguments should be rejected for multiple independent reasons. *First*, Plaintiffs claim Defendants violated Section 11(b) of the Voting Rights Act of 1965 by purportedly intimidating, threatening, or coercing Plaintiffs for urging others to vote. But the standard notices Meta sends users about violations of its policies are not objectively intimidating, threatening, or coercive. Nor can Plaintiffs establish that Defendants intended to intimidate, threaten, or coerce users for urging others to vote. Plaintiffs must demonstrate both for their Section 11(b) claim to succeed. *Second*, Plaintiffs allege that Defendants are engaged in a conspiracy to violate the Ku Klux Klan Act of 1871 by preventing voters through force, intimidation, or threat from supporting Kennedy's candidacy or by injuring voters for such support. Again, Plaintiffs have not—and cannot—establish that Meta's informing users of violations of its policies or removal of content pursuant to those policies constitutes force, intimidation, or threat under the Act. And, even accepting Plaintiffs' deficient allegations at face value (a more lenient

standard than appropriate for a preliminary injunction motion), a conspiracy cannot be premised on an intracorporate agreement. Even if it could, Plaintiffs offer no evidence to support their speculation that Meta's subsidiaries and employees are engaged in a secret conspiracy to thwart users from supporting Kennedy's third-party presidential bid. *Third*, in all events, Plaintiffs' statutory claims are barred by Section 230 of the Communications Decency Act because they seek to impose liability on Meta for the exercise of traditional editorial functions: deciding whether and how to display and disseminate third-party content on its online services.

Plaintiffs' request for an unprecedented, unconstitutional injunction should be denied.[1]

## STATEMENT OF FACTS

### A.      Meta's Facebook And Instagram Services

Meta operates Facebook, a service that enables users to create personal profiles, connect with each other, and view and engage with content posted to the service. Among other things, Facebook's more than 3 billion users can view or share content, scroll through their feeds to see posts and advertisements, and message others. Meta also operates Instagram, a service that allows more than 1 billion users to share and interact with content, message others, and more.[2]

To ensure a safe, secure, and enjoyable experience for its users and foster community on its services, Meta has established policies regarding content users may (and may not) post. *See* Declaration of Sonal N. Mehta ("Mehta Decl.") Ex. E (Facebook Community Standards); *id.* Ex. F (Instagram Community Guidelines). A "staggering" amount of content is posted to its services. *E.g.*, *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 480 (2023) ("for *every minute* of the day, approximately … 510,000 comments are posted on Facebook"). To apply its policies to this deluge, Meta relies on technology that "proactively detects and removes the vast majority of violating content before anyone reports it," as well as more than 15,000 human reviewers around the world. Mehta Decl. Ex. G. While Meta endeavors to enforce its policies with a high degree of

---

[1] There are a number of other defects with Plaintiffs' claims, including that Plaintiffs make no showing of Defendant Zuckerberg's involvement in any of the actions they challenge, as well as other threshold defects that warrant dismissal at the pleading stage. Meta does not raise all such defects here, but will raise them with the Court as appropriate in its forthcoming motion to dismiss.

[2] Facebook, *Our Mission*, https://about.fb.com/company-info./ (last visited August 6, 2024); Instagram, *About Us*, https://about.instagram.com/about-us (last visited August 6, 2024).

accuracy, automated moderation may sometimes incorrectly determine "whether a piece of content violates [Meta's] policies," allowing human "[r]eview teams [to] then make the final call." *Id.* Ex. H. The Facebook Terms of Service and the Instagram Terms of Use make clear that Meta "can't guarantee" that its services "will work perfectly all the time," and users agree to these terms when they sign up for and use the services. Mehta Decl. Ex. D; *see also id.* Ex. C. Though Meta independently enforces its rules, it develops those rules based on feedback from "experts in fields like technology, public safety, and human rights," and its commitment to "standards that include different views and beliefs, especially from people and communities that might otherwise be overlooked or marginalized." *Id.* Ex. E.

Meta's approach to moderating political content has evolved over the years. Mehta Decl. Ex. I. Meta's users have told Meta that "they want to see less political content," prompting Meta to "spen[d] the last few years refining [its] approach … to reduce the amount of political content—including from politician's accounts" recommended to Facebook and Instagram users. *Id.* To carry out this policy, Meta's algorithms recommend less political content to its users. It does so based on its editorial judgment that this approach is likely to foster community and result in a more enjoyable user experience. *Id.* If users prefer a different experience from this default recommendation policy, they can still "find and interact with political content," and use Meta's "customization tools" to "personalize what [they] see." *Id.*

Meta has also adopted policies prohibiting certain categories of misinformation on Facebook and Instagram. Mehta Decl. Ex. J. Meta's policy is to remove misinformation "where it is likely to directly contribute to the risk of imminent physical harm," or "to directly contribute to interference with the functioning of political processes." *Id.* For other types of misinformation, Meta focuses on "reducing its prevalence or creating an environment that fosters a productive dialogue." *Id.* That includes "provid[ing] resources to increase media and digital literacy," "partner[ing] with third-party fact checking organizations," and, taking enforcement actions and decreasing distribution of accounts that "repeatedly share …misinformation." *Id.*[3]

---

[3] Kennedy is no stranger to Meta's misinformation policies. His organization, Children's Health Defense ("CHD"), sued Meta after it repeatedly violated such policies. *See Children's Health*

Other policies prohibit content that is inauthentic, misleading, or otherwise includes features that, in Meta's judgment based on feedback from its users, fail to foster community or lead to an unsafe, insecure, or unenjoyable user experience. For example, Meta may prevent or remove posts that appear to reflect "behavior that artificially boosts views or engagement," including "the coordinated, artificial distribution of the same content at high rates across multiple, seemingly disparate entities." Mehta Decl. Ex. K. And Meta may also restrict posts "containing links directing people to websites that request personal information before showing content," because of the potential security threat posed by potential "phishing" sites and because users have "told [Meta] they do not like" websites that engage in this behavior. *Id.* Ex. L. Each of these policies is based on Meta's editorial judgment about how to foster community and create the safest, most secure, and most enjoyable experience for its users.

## B.   The Alleged Content At Issue Here

Plaintiffs' suit centers on a thirty-minute video entitled *Who is Bobby Kennedy*. Plaintiff American Values 2024 ("AV24") posted a trailer to the video on its Facebook page on May 3, 2024, and other users began attempting to share links to the website whoisbobbykennedy.com, where the full video was available. FAC ¶¶ 23, 28-33. The website itself contains limited content— the video, links to posts containing the video on YouTube, Facebook, Instagram, and X (formerly Twitter), and fields for visitors to enter their name, email, and zip code. Mehta Decl. Ex. M. Meta's automated moderation initially determined that the website bore characteristics similar to those of urls deployed in phishing attacks, in which misleading links attempt to trick users into sharing their personal information. Mehta Decl. Ex. A ¶ 7.[4] Automated moderation thus identified the link as

---

*Defense v. Facebook, Inc.*, 546 F. Supp. 3d 909 (N.D. Cal. 2021), *appeal pending*, No. 21-16210 (9th Cir.). In that case, the district court dismissed with prejudice similar claims challenging Meta's protected moderation. The Court rejected arguments that Meta acted jointly with or was coerced by governmental actors when it took certain actions regarding content identified by independent fact checkers as containing false or misleading information. *Id.* at 915. Judge Illston reasoned that CHD's allegations did not support a plausible inference that any governmental actor either participated in the specific moderation decisions at issue nor threatened Meta to "take any specific action with regard to CHD." *Id.* at 928, 933.

[4] Exhibits A and B to the Mehta Declaration are declarations from Meta employees whose identities Meta has sought to seal to avoid the risk of harassment or threats of these individuals.

violative of Meta's policies and automatically deleted content containing the link. Mehta Decl. Ex. A ¶ 6. It is not uncommon for newly created urls that suddenly receive a great deal of traffic from Facebook to raise red flags. *Id.* ¶ 7.

Meta has procedures in place to address mistakes like these, especially when they affect public figures, including political candidates. Here, for example, a Meta employee on the Government and Social Impact team handles outreach from the Kennedy campaign to alert Meta to issues like this. Mehta Decl. Ex. A ¶ 4. On Saturday, May 4, 2024, after being contacted by representatives from the Kennedy campaign, that employee informed members of Meta's High Priority Escalations team of this issue. *Id.* ¶ 5. The process worked: Within 30 minutes, human reviewers at Meta reviewed the link, determined that the automated restriction of the url was a mistake, and took steps to correct it. *Id.* ¶ 8. The full video remains available on AV24's Facebook page as of the date of this filing. *Id.* Ex. N. A link to the video is also available on the Instagram Page of user @whoisbobbykennedy, the X account of user @WhoIsRFKJr, and the YouTube account of Who is Bobby Kennedy?, each of which is linked to by whoisbobbykennedy.com. *Id.* Exs. O, P, Q, M.

Plaintiffs' amended complaint adds a new plaintiff, Jessica Reed Kraus, who claims (at 8) that she is an "independent journalist" who has "invested significant time following candidates Trump and Kennedy on the campaign trail." Plaintiffs claim (at 8) that when Reed Kraus posted content regarding Kennedy "her account lost 40,000 followers overnight." But Reed Kraus's speculation that there is some connection there ignores a far more reasonable explanation—that users voluntarily stopped following her based on the content she was posting. Plaintiffs also complain (at 8-9) that Reed Kraus's content has gained fewer views and been subject to a variety of enforcement actions. But a review of the content posted to Instagram by Reed Krauss containing the words "RFK" or "Kennedy" revealed that *none* of those posts were subject to enforcement actions. Mehta Decl. Ex. B ¶ 5. So too with the less than 13 minutes that Reed Kraus was without access to her Instagram account on May 3, 2024. That action had nothing to do with her posts

---

Meta explains these risks and the corresponding basis for its sealing request in the accompanying motion to seal and in a declaration from its Director of Global Security Threat Management and Privacy Response filed therewith.

about Kennedy—it resulted from a post that violated Meta's policy against threats of physical violence. *Id.* ¶¶ 6-10.

Plaintiffs also complain that Meta's AI ChatBot has given incorrect information regarding Kennedy's candidacy, FAC ¶ 68, but ignore the reality that AI technologies are nascent and results "cannot be predicted in advance," Mehta Decl. Ex. R. Indeed, Meta's AI Terms of Service expressly warn users that AI responses may be inaccurate or objectionable. *Id.*

### C.    Allegations Regarding Meta's Interactions With The Government

Plaintiffs claim that, beginning in early 2021, at the height of the COVID-19 pandemic, "Government officials … asked social media platforms to block Kennedy's efforts to communicate with the public and … the platforms have complied." Mot. 2-3. For this proposition, Plaintiffs rely on a quote from Justice Alito's dissent from the denial of a motion to intervene in *Murthy v. Missouri*, 144 S. Ct. 32, 32 (2023). Plaintiffs also attempt to rely (at 3) on two district court decisions in support of their factual contentions regarding government communications in 2021 and 2022—the first of which involved factual findings held by the Supreme Court to be "clearly erroneous," *Murthy*, 144 S. Ct. at 1988 n.4, and the second of which has been remanded to the district court in light of the Supreme Court's rejection of the first, *Kennedy v. Biden*, No. 24-30252, Dkt. 49 (5th Cir. July 25, 2024). Beyond the shaky reliance on these two cases, the FAC identifies a few communications between Meta and government officials from 2021—*three years* before the claimed content moderation actions at issue here. *E.g.* FAC ¶¶ 163-165. Critically, Plaintiffs offer no evidence that any government official ever communicated with—much less threatened adverse action against—Meta in connection with the specific content at issue.

### D.    This Litigation

Plaintiffs initially filed this suit on May 13, alleging violations of the First Amendment and 18 U.S.C. §§ 1985 and 1986 against Defendants Meta, Facebook Operations, LLC, Instagram, LLC, and Mark Zuckerberg, based on Meta's temporary restriction of links to the *Who Is Bobby Kennedy* video on Facebook and Instagram. Dkt. 1. After stipulating to a briefing schedule on Meta's motion to dismiss that would have resulted in an October hearing, Dkt. 24, Plaintiffs filed their FAC and the instant motion on July 23, 2024, one week before Meta's motion to dismiss was

to be filed. Dkts 28-30. The FAC alleges the same claims (though re-ordered to deemphasize Plaintiffs' First Amendment claim) and adds a claim that Meta violated Section 11(b) of the Voting Rights Act. Dkt. 28. The FAC also expands its focus from allegations about the restrictions on links to the *Who Is Bobby Kennedy* video to allegations about Meta's content moderation of other posts supporting Kennedy's candidacy, and, as noted, adds Plaintiff Reed Kraus.

## STANDARD OF REVIEW

 "A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). If a plaintiff makes a heightened showing that "the 'balance of hardships … tips sharply towards' it," a showing of "serious questions going to the merits," can support a preliminary injunction, provided the irreparable harm and public interest factors are also satisfied. *Id.* "A preliminary injunction is an extraordinary remedy never awarded as of right," and is instead subject to the Court's equitable discretion. *Winter*, 555 U.S. at 24. Plaintiffs cannot merely rest on their allegations: "'the requirement for substantial proof' is high and 'the movant, *by a clear showing*, carries the burden of persuasion.'" *Doe I v. Google LLC*, 2023 WL 6882766, at *1 (N.D. Cal. Oct. 18, 2023) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

## ARGUMENT

**I. Plaintiffs' Requested Injunction Is Barred By The First Amendment**

"[I]n case after case, the [Supreme] Court has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm." *NetChoice*, 144 S. Ct. at 2402. This rule applies to courts, just like any other government actor. Courts accordingly refuse to award any remedy—including an injunction—that would trammel on another party's First Amendment rights, unless the remedy satisfies heightened scrutiny. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *Maldonado v. Morales*, 556 F.3d 1037,1047 (9th Cir. 2009); *Sabelko v. Phoenix*, 120 F.3d 161, 164 n.2 (9th Cir. 1997). Plaintiffs make no attempt to—nor could they—meet the "more stringent application of general First Amendment

1    principles" required by these precedents. *E.g.*, *Maldonado*, 556 F.3d at 1047.

2         Granting the requested injunction would unjustifiably intrude on Meta's First Amendment

3    rights. As the Supreme Court held just last month, "[a] private party's collection of third-party

4    content into a single speech product … is itself expressive, and intrusion into that activity must be

5    specially justified under the First Amendment." *NetChoice*, 144 S. Ct at 2401. That includes a

6    provider of an interactive computer service deciding to "remove, alter, organize, prioritize, or

7    disclaim posts" from third-party users; the First Amendment protects "exactly the[se] kind[s] of

8    editorial judgments." *Id.* at 2394, 2399-2401. The Supreme Court held that these protections

9    extend to "prioritization of content, achieved through the use of algorithms," and to "removing a

10   post." *Id.* at 2403-2404. When Meta "decide[s] which third-party content [its services] will display,

11   or how the display will be ordered and organized, [it is] making expressive choices. And because

12   that is true, [it] receive[s] First Amendment protection." *Id.* at 2406.

13        Plaintiffs' requested injunction would infringe on precisely these sorts of protected

14   expressive activities. Plaintiffs ask the Court to order Meta to disseminate content Meta has

15   previously removed or restricted, allow Facebook and Instagram users to continue posting that

16   content regardless of whether it violates Meta's policies and terms, "implement changes" to Meta's

17   "content-moderation algorithms," and even to "say[] expressly" that it will continue to disseminate

18   content containing Plaintiffs' favored speech. Dkt. 29-4. The requested injunction would force

19   Meta to effectively create a rule- and moderation-free zone exclusively for Kennedy and his

20   supporters—unavailable to his political opponents.  That would be antithetical to Meta's right to

21   apply its policies and terms in accord with its protected editorial judgment, including to foster

22   community and craft a safe, secure, and enjoyable user experience. And the harm of Plaintiffs'

23   requested injunction extends beyond Meta to the public, which has a "strong interest in the integrity

24   of [Meta]'s platforms, [Meta]'s policing of those platforms for abuses, and [Meta]'s protection of

25   its users' privacy." *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27,

26   2019). Plaintiffs may disagree with these editorial judgments, but the First Amendment protects

27   Meta's right to make them. *See NetChoice*, 144 S. Ct. at 2394, 2399-2401.

28        Nor can Plaintiffs save their requested unconstitutional injunction by asserting Meta was a

state actor when it moderated the at-issue content on its services. Setting aside Plaintiffs' failure to establish state action, *infra* Part II.A, the Ninth Circuit has long recognized that "[e]ven if state action [is] present" in a private publisher's editorial decisions, the private entity "still [has] the freedom to exercise subjective editorial discretion" over speech it disseminates. *Associates & Aldrich Co. v. Times Mirror Co.*, 440 F.2d 133, 135 (9th Cir. 1971). The Ninth Circuit has held that even where a private party's initial action was tainted by government coercion, "[i]t does not follow … that [the private actor] may never thereafter decide independently to exclude [a third party's] messages from its … network. It only follows that the *state* may never *induce* [the private party] to do so." *Carlin Comm'ns, Inc. v. Mountain States Tel. and Tel. Co.*, 827 F.2d 1291, 1296-1297 (9th Cir. 1987) (emphasis original). And even "the mere fact that the government compelled a result does not suggest that the government's action is fairly attributable to the private defendant." *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999). Otherwise, private victims of coercion would be constitutionally liable even though they were "left with no choice of their own" regarding the conduct at issue. *Id.* Thus, the appropriate remedy for even a properly supported state-action claim (which this is not) would be an injunction *against the government* declaring that it must cease such coercion. Indeed, Kennedy is seeking just that in parallel litigation against the government officials who purportedly caused Meta to restrict his content on Facebook and Instagram. *See Kennedy v. Biden*, No. 23-cv-0381 (W.D. La.). But an injunction requiring Meta to disseminate particular content, issue particular statements, or change the means by which it moderates or recommends content on its expressive services would itself constitute government-compelled speech, *see National Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 766 (2018), and would unduly intrude on Meta's editorial discretion. *See NetChoice*, 144 S. Ct at 2401-2407. Plaintiffs' motion should be denied for this reason alone.

## II.     Plaintiffs' First Amendment Claim Cannot Support A Preliminary Injunction

Plaintiffs offer (at 21-22) a paltry two pages in support of their First Amendment claim. Paradoxically, it is the only claim on which Plaintiffs attempt to make *any* showing (at 22-23) on the equitable *Winter* factors. They hinge their claim to irreparable injury, priority in the balance of the equities, and alignment with the public interest entirely on their purported First Amendment

showing, failing to advance any equitable arguments at all in connection with their statutory claims. And yet Plaintiffs do not even attempt to assert a likelihood of success on the merits, instead claiming they have merely raised "serious questions" about the strength of that claim. Even if they had, they have failed to show that the equitable factors would favor them.

## A.   Plaintiffs' First Amendment Claim Fails

Plaintiffs' First Amendment Claim suffers from a fatal defect: It is asserted against private entities not bound by the First Amendment. As in *O'Handley*, private entities like Meta that decide what content to disseminate on their online services and how are not subject to constitutional constraints. The same is true for Mark Zuckerberg, a private individual to whom First Amendment constraints do not apply and for whom Plaintiffs have failed to identify any conduct that allegedly violates the First Amendment.

The First Amendment "does not prohibit *private* abridgment of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019). Thus, as in *O'Handley*, "a private company," like Meta "is not ordinarily subject to the Constitution's constraints." 62 F.4th at 1155. Plaintiffs accordingly "face[] a formidable threshold hurdle." *Prager Univ. v. Google LLC*, 951 F.3d 991, 996 (9th Cir. 2020). They must establish that Meta's conduct fits within one of the "few limited circumstances" where private conduct is deemed "state action." *See Halleck*, 587 U.S. at 809. That hurdle is particularly high where, as here, Plaintiffs' suit implicates Meta's own First Amendment rights. *Supra* Part I. Plaintiffs fail to show this is an "exceptional case[]" in which Meta may be "treated as a state actor for constitutional purposes." *O'Handley*, 62 F.4th at 1155-1156.

Whether a private entity may be treated as a state actor depends on "the two-step framework developed in *Lugar v. Edmonson Oil Co.*, 457 U.S. 922 (1982)." *O'Handley*, 62 F.4th at 1156. Under *Lugar*, courts "first ask whether the alleged constitutional violation was caused by the 'exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.'" *Id.* (quoting *Lugar*, 457 U.S. at 937). "If the answer is yes, [courts] then ask whether 'the party charged with the deprivation [is] a person who may fairly be said to be a state actor.'" *Id.* Taken together, the inquiry asks whether the alleged "'wrongdoer is clothed with the authority of state law.'" *Id.* at 1157.

As in *O'Handley*, Plaintiffs' claim "falter[s] at the first step." 62 F.4th at 1156. Plaintiffs fail to demonstrate that Meta's authority to exercise editorial discretion over the content at issue stemmed from any State-created "right or privilege," or from any "rule of conduct imposed by the State." *Lugar*, 457 U.S. at 937. Instead, Plaintiffs concede that Meta exercised editorial discretion on such content in accordance with its "algorithms, policies, and terms of service." FAC ¶ 182. Just as in *O'Handley*, Meta's right to remove or restrict such content "derives from its user agreement[s]" and required no conferral of power or imposition of obligations by the government. 62 F.4th at 1156. Plaintiffs thus fail to allege the first *Lugar* prong because Meta "acted under the terms of its own rules, not under any provision of California [or federal] law." *Id.*[5]

*Lugar*'s second prong "ask[s] whether 'the party charged with the deprivation [is] a person who may be fairly said to be a state actor.'" *O'Handley*, 62 F.4th at 1157 (quoting *Lugar*, 457 U.S. at 937). *Lugar* "outlined four tests to determine the answer to that question: (1) the public function test, (2) the state compulsion test, (3) the nexus test, and (4) the joint action test." *Id.* (citing *Lugar*, 457 U.S. at 939). Plaintiffs do not—and could not—invoke the public function test, and fail to allege state action under any formulation of the latter three tests.

The "intentionally demanding" joint action test requires Plaintiffs to show "a 'meeting of the minds' between the government and the private party to 'violate constitutional rights.'" *O'Handley*, 62 F.4th at 1159-1160. The nexus and state compulsion tests similarly "address the degree to which the state is intertwined with the private actor or action." *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 995 n.13 (9th Cir. 2013). These tests focus on whether the government *coerced* a private party to take a particular action. The most common formulation of the nexus test requires plaintiffs to show that that government officials have "'exercised coercive power or [have] provided such significant encouragement, either overt or covert, that the choice [to take the

---

[5] "Under the original formulation of the *Lugar* framework, … failure to satisfy the first step would have been fatal." *O'Handley*, 62 F.4th at 1157; *see also Collins v. Womancare*, 878 F.2d 1145, 1151 (9th Cir. 1989) ("Both elements under *Lugar* must be met for there to be state action."); *Wright v. Service Empls. Int'l Union Local 503*, 48 F.4th 1112, 1121 (9th Cir. 2022) (similar). And even if the first prong were not dispositive, failure to allege the first prong "makes it much less likely that [a plaintiff] can satisfy the second because the two steps are united in a common inquiry.'" *O'Handley*, 62 F.4th at 1157.

challenged action] must in law be deemed to be that of the State.'" *O'Handley*, 62 F.4th at 1157. The state compulsion test adopts a similar formulation. *Naoko Ohno*, 723 F.3d at 995 n.13 (requiring "a showing that 'the state has "exercised coercive power or has provided such significant encouragement, either overt or covert, that the [private actor's] choice must in law be deemed to be that of the State."'"). Moreover, as the Supreme Court recently held, "[a] government official can share her views freely[,] … criticize particular beliefs, and … do so forcefully in the hopes of persuading others to follow her lead" without violating the First Amendment. *Vullo*, 602 U.S. at 188. Only coercion violates the First Amendment; persuasion does not.

Here, Plaintiffs' First Amendment claim is meritless because they identify no direct connection between the alleged government communications in 2021 and 2022 (before Kennedy was a presidential candidate) and any of the challenged content moderation actions that Meta allegedly undertook beginning in May 2024 supposedly relating to his candidacy. In *Murthy*, the Supreme Court held that the plaintiffs seeking a preliminary injunction could not establish standing to challenge alleged government influence over content moderation decisions of Meta and others where they failed to show "that a particular defendant pressured a particular platform to censor a particular topic before that platform suppressed a particular plaintiff's speech on that topic." 144 S. Ct. at 1988; *see also O'Handley*, 62 F.4th at 1157 (requiring showing that "government officials threaten[ed] adverse action to coerce a private party into performing a *particular* act" (emphasis added)). Plaintiffs demonstrate no such connection. They ignore the significant *temporal* gap between the alleged government communications that had "considerably subsided by 2022," *Murthy*, 144 S. Ct at 1994, and the alleged 2024 content moderation decisions at issue here. And they ignore the significant *substantive* gap between the government communications they rely on and the content at issue here: The communications allegedly pertaining to Kennedy concerned COVID-19 misinformation, not Kennedy's 2024 candidacy, which had not even been announced at that time. Nor do Plaintiffs identify a single threat to use the power of the State against Meta if it failed to restrict the specific content at issue; their vague allegations (at 21-22) of "pressure" or "partnership" in 2021 and 2022 on unrelated topics fall far short of what *Vullo* and *Murthy* require.

Unable to muster facts to suggest state action with respect to the challenged conduct at

issue here, Plaintiffs are forced to rely (at 21-22) on the factual findings of out-of-district district court decisions that have either been rejected by the Supreme Court as "clearly erroneous," *see Murthy*, 144 S. Ct at 1988 n.4, or remanded for further proceedings in light of the Supreme Court's rejection of similar findings, *see Kennedy v. Biden*, No. 24-30252, Dkt. 49 (5th Cir. July 25, 2024). Plaintiffs' attempts to bootstrap their claim to clearly erroneous factual findings only highlights the lack of actual factual support for their claims.

In short, Plaintiffs' allegations regarding the government's influence on Meta boil down to this: between two and three years ago, some government officials allegedly asked Meta to take action against content related to Kennedy and the COVID-19 pandemic. The Court need not—and should not—credit these bare allegations on a preliminary injunction motion. But even if it did, they would fail. Plaintiffs draw no connection between the substance of these communications and the substance of the content at issue here. And Plaintiffs offer nothing to demonstrate that these communications from years ago rise to the level of government coercion necessary to view Meta's content moderation actions as ceding its content moderation decisionmaking to the government.[6]

Plaintiffs fail to satisfy the second prong of *Lugar* to establish state action. Because state action is a prerequisite to First Amendment liability, their First Amendment claim fails.

**B.**   **Plaintiffs' Perfunctory Recitation Of The Remaining *Winter* Factors Is Insufficient**

On the remaining preliminary injunction factors, Plaintiffs offer only two sentences in their Motion (at 22-23) and a cross-reference in their Notice of Motion to conclusory allegations of harm from their Complaint (at 2 (citing FAC ¶¶ 16-22)). Those limited arguments depend entirely on their *ipse dixit* that they have raised serious questions regarding the merits of their First Amendment claim. "But the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA – The Wireless Ass'n v. Berkeley, Cal.*, 928 F.3d 832, 851 (9th Cir. 2019). Because Plaintiffs' First Amendment claim is meritless, *supra* Part II.A, they cannot rely on this shortcut to satisfy the preliminary injunction standard.

---

[6] Plaintiffs have offered no evidence that Mr. Zuckerberg was involved in any of the challenged content moderation actions.

1    Without this shortcut, Plaintiffs' arguments collapse. They fail, for example, to show any

2   irreparable harm, asserting at most that third-party users of Meta's Facebook and Instagram

3   services were unable to post Plaintiffs' preferred content on those services to the extent that

4   Plaintiffs would prefer. But "[t]he right to freedom of speech does not open every avenue to one

5   who desires to use a particular outlet for expression." *Aldrich*, 440 F.2d at 135. And Plaintiffs

6   concede that there are ample channels for spreading their preferred content, including Plaintiffs'

7   own websites, FAC ¶¶ 14-15, 23, 59, 61, 67, 69, 70, and other social media services, *e.g.*, *id.* ¶ 52

8   (*Who Is Bobby Kennedy* film's "original posting" viewed "one hundred million times" on X). As

9   in a similar case filed by Kennedy in this District, the "numerous other ways" for sharing the

10   content at issue, including other social media services, refutes any claim of irreparable harm.

11   *Kennedy v. Google LLC*, 688 F. Supp. 3d 951, 961 (N.D. Cal. 2023).

12    Nor have Plaintiffs established that the balance of equities favors them, "sharply" or at all.

13   Indeed, they seek an injunction that would infringe directly and dramatically on Meta's protected

14   expressive activity by overriding policies designed to foster community and provide a safe, secure,

15   and enjoyable experience to its users. *Supra* Part I; Dkt. 29-4. Indeed, Plaintiffs go further,

16   demanding that Meta be compelled to communicate to its users an intent to disseminate and

17   recommend such content on Facebook and Instagram. *Id.* Meta's constitutional protections from

18   being compelled by the government—here, this Court—to disseminate or recommend the content

19   of others on its privately owned online services, *supra* Part I, outweighs Plaintiffs' desire for their

20   supporters to have their speech disseminated on the particular online services offered by Meta.

21   And, although the *Kennedy v. Google* case cited above concluded that the equities were "somewhat

22   balanced" and thus tipped in favor of Kennedy in that case, the court nevertheless denied his

23   similar request for preliminary injunctive relief. 688 F. Supp. 3d at 961.

24    Finally, Plaintiffs' requested injunction would be counter to the public interest. Facebook

25   and Instagram serve billions of users, for whom Meta has adopted policies designed to create a

26   safe, secure, and enjoyable user experience and foster community on Facebook and Instagram. To

27   ensure the continuity of that experience, Meta must be able to exercise its protected editorial

28   discretion regarding the content it disseminates and recommends on those services. Neither the

public nor Meta's users are served by Plaintiffs' brazen request for what effectively amounts to a carve-out from Meta's terms and policies for content they would prefer be disseminated on Facebook and Instagram. In short, Meta's "ability to decisively police the integrity of its platforms is without a question a pressing public interest." *Stackla, Inc.*, 2019 WL 4738288, at *6. Because Plaintiffs' injunction would threaten that interest, violate Meta's First Amendment rights, and prevent no irreparable injury, their motion should be denied.

### III.   Plaintiffs Fail To Advance An Argument For Equitable Relief On Their Statutory Claims, Which Are, In Any Event, Meritless And Barred By Section 230

As noted, Plaintiffs do not advance any argument about (1) their irreparable harm from the alleged statutory violations, (2) the balance of the equities were the Court to afford them preliminary injunctive relief on these claims, or (3) why the public interest weighs in favor of granting them a preliminary injunction on the statutory claims. Because Plaintiffs have made no argument—let alone showing—on these equitable factors, the Court need not reach the merits of Plaintiffs' statutory claims. Whatever Plaintiffs' likelihood of success on the merits, they would not be entitled to equitable relief having made no showing on three of the four preliminary injunction factors. The motion can be denied on that basis alone and the Court need not reach the merits of those claims. *See, e.g.*, *Altman v. County of Santa Clara*, 464 F. Supp. 3d 1106, 1115 (N.D. Cal. 2020) ("To grant preliminary injunctive relief, a court must find that 'a certain threshold showing [has been] made on each factor.'" (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per curiam)). Nonetheless, in the event the Court does reach that question, Plaintiffs have no likelihood of success on the merits of their statutory claims.

### A.   Plaintiffs' VRA Section 11(b) Claim Fails

Plaintiffs have no likelihood of success on their VRA Section 11(b) claim. They argue that Defendants are violating Section 11(b) by using content moderation to intimidate, threaten, and coerce Plaintiffs for urging other people to vote for Kennedy. Mot. 12-14; *see also* FAC ¶¶ 98, 104-105, 107-108. Plaintiffs' attempt to exploit this important voting rights statute to dictate the content Meta must disseminate on Facebook and Instagram is as unprecedented as it is meritless.

As relevant here, Section 11(b) of the VRA states: "No person, whether acting under color of law or otherwise, shall … intimidate, threaten, or coerce … any person for urging … any person

1   to vote or attempt to vote." 52 U.S.C. § 10307(b). The statute provides important protection against

2   a variety of voter suppression schemes—like making robocalls telling recipients that voting by

3   mail will subject them to police surveillance and credit card debt collection, *see Nat'l Coal. on*

4   *Black Civic Participation v. Wohl*, 661 F. Supp. 3d 78 (S.D.N.Y. 2023); publishing names and

5   home addresses of individuals inaccurately characterized as having committed felony voter fraud,

6   *see League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal*

7   *Found.*, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018); and following voters from polling locations

8   and copying their license plate information, *see Arizona All. for Retired Americans*, 638 F. Supp.

9   3d 1033, 1044 (D. Ariz. 2022) (discussing *Daschle v. Thune*, No. 04-CV-4177 (D.S.D. Nov. 2,

10  2004)).

11  To state a claim under the statute, Plaintiffs must demonstrate both that (1) Meta's content

12  moderation is *objectively* threatening, intimidating, and coercive, *see, e.g.*, *Nat'l Coal. on Black*

13  *Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020); and (2) that Meta had a

14  *subjective intent* that its editorial decisions would threaten, intimidate, and coerce users for urging

15  others to vote, *see Counterman v. Colorado*, 600 U.S. 66, 76-77 (2023); *see also Fair Fight Inc.*

16  *v. True the Vote*, 2024 WL 24524, at *48 (N.D. Ga. Jan. 2, 2024), *appeal filed*, No. 24-10372 (11th

17  Cir. May 13, 2024) (applying *Counterman* to a Section 11(b) claim). The latter requirement stems

18  from the First Amendment, which requires that punishment for threatening speech requires proof

19  of "subjective" intent to threaten. Plaintiffs satisfy neither requirement.

20  As an initial matter, only Plaintiff Reed Kraus has statutory standing to bring a claim under

21  Section 11(b). Plaintiffs allege that Meta took action only against the posts and account of Reed

22  Kraus (in addition to other non-plaintiff, third-party users). Plaintiffs do not allege that AV24 or

23  Kennedy were the recipient of any allegedly intimidating, threatening, or coercive communications

24  or actions by Meta, and these Plaintiffs cannot sue on behalf of unidentified third parties who were

25  allegedly threatened, intimidated, or coerced by Meta. *See Mills v. United States*, 742 F.3d 400,

26  406 (9th Cir. 2014) (plaintiffs "cannot rest [their] claim[s] to relief on the legal rights or interests

27  of third parties").

28  Moreover, none of Meta's alleged content moderation as to Plaintiff Reed Kraus' or the

non-party users' Facebook and Instagram accounts or content was objectively intimidating, threatening, or coercive. Plaintiffs say that Meta (1) "threaten[ed]" users by communicating "warnings that users' accounts would be suspended if they continued urging people to vote for Mr. Kennedy"; (2) "intimidate[ed]" users through those warnings and "account suspensions," and by "disseminating 'false utterances'" about *Who Is Bobby Kennedy*; and (3) "coerc[ed] users by blocking and shadow-banning their content." Mot 13-14. Common to Plaintiffs' arguments on each prong of Section 11(b) is Plaintiffs' attempt to contort the basic implementation of Meta's content moderation policies into threats and acts of intimidation and coercion. But all of the actions they point to—(1) the restriction or removal of posts, (2) warnings that come along with those restrictions or removals (*e.g.*, that the content is spam or contains violent or graphic content), (3) warnings of account suspension if users continue trying to post restricted content, and (4) account suspension—are ordinary content moderation actions.[7]

No "reasonable recipient familiar with the context … would interpret" Meta's content moderation as "a threat of injury tending to deter individuals from exercising their voting rights." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020). Rather, a reasonable recipient would view Meta's at issue content moderation actions as the unremarkable implementation of Meta's various content moderation policies. That is true regardless of whether the particular action is the intended result of Meta's policies regarding political content and misleading or inauthentic content, or the mistaken flagging of a post based on fallible algorithmic moderation processes. *See supra* 3-6. Unsurprisingly, Plaintiffs identify no case in which a social media service's implementation of its agreed-upon content-moderation policies to curate whether and how content appears on its service was even the target of a Section 11(b) claim, let alone a successful one. These facts bear no resemblance to the voter suppression schemes intended to be addressed by the statute.

Importantly, Plaintiffs concede that "a platform's content moderation is not coercive when it simply enforces a platform's agreed-upon terms of service." Mot. 14. But Plaintiffs offer no

---

[7] As with their First Amendment claim, Plaintiffs offer no evidence that Mr. Zuckerberg had any involvement in the content moderation decisions at issue.

1   basis to find that the challenged actions here are anything but. Under Meta's policies—which users

2   agree to when they agree to Facebook's and Instagram's terms of service—political content is

3   deprioritized and misleading or inauthentic posts are removed or restricted. *Supra* 3-5. Meta's

4   content moderation sometimes results in false positives (when posts are mistakenly removed or

5   restricted) and sometimes results in false negatives (when posts are mistakenly left up). But users

6   agree that Facebook and Instagram are offered to them "as is"—including with these

7   "imperfections." Mehta Decl. Ex. C; *see also id*. Ex. D (similar). In other words, mistakes like

8   these, just as much as true positives, are *part of* the "agreed-upon terms of service," making

9   Plaintiffs' concession fatal to their Section 11(b) claim.

10          As to the second requirement, Plaintiffs do not allege, let alone demonstrate as they must

11   for a preliminary injunction, that Meta had any degree of subjective intent to threaten, intimidate,

12   or coerce Plaintiffs (or any of the non-plaintiff users) for urging others to vote. Plaintiffs instead

13   argue (at 11) that Section 11(b) does not require proof of subjective intent. But because the

14   statutory prohibition implicates Meta's own speech and expression, proof of subjective intent is

15   required. *See Counterman*, 600 U.S. at 74; *see also NetChoice*, 144 S. Ct. at 2406 (holding that

16   when "platforms use their Standards and Guidelines to decide which third-party content those

17   feeds will display, or how the display will be ordered and organized, they are making expressive

18   choices," for which "they receive First Amendment protection"); *id.* at 2404 (same for "labels,"

19   including "warning[s]" applied to certain content). Having made no showing that Meta intended

20   to threaten, intimidate, or coerce Plaintiffs by implementing its content moderation policies,

21   Plaintiffs' Section 11(b) necessarily fails.

22          **B.      Plaintiffs' Section 1985(3) Claim Fails**

23          Plaintiffs also have no likelihood of success on their 42 U.S.C. § 1985(3) claim. Section

24   1985 was originally enacted as Section 2 of the Ku Klux Klan Act, which was "designed to protect

25   oppressed southern blacks from the violence of the vindictive Ku Klux Klan." *Canlis v. San*

26   *Joaquin Sheriff's Posse Comitatus*, 641 F.2d 711, 719-720 (9th Cir. 1981). In particular, the

27   Support and Advocacy Clause of Section 1985(3)—the only part of the statute on which Plaintiffs

28   rely—was meant to reach conspiracies to use or threaten the use of physical force to interfere with

political participation in the wake of the Civil War. To state a claim under the Support and Advocacy Clause, a plaintiff must plead (1) a conspiracy; (2) for the purpose of either (a) preventing the plaintiff by force, intimidation, or threat from giving her support or advocacy toward or in favor of the election of any qualified person for (as relevant here) President, or (b) injuring the plaintiff on account of such support or advocacy; (3) that the plaintiff is a citizen who is lawfully entitled to vote; (4) an act in furtherance of the conspiracy; and (5) that the plaintiff was injured in his person or property. *See* 42 U.S.C. § 1985(3). Plaintiffs fail to satisfy these elements.[8]

***No Conspiracy.*** Plaintiffs have not established that they are likely to succeed in showing that Defendants are engaged in a conspiracy to prevent Facebook and Instagram users from supporting Kennedy or to injure them for such support.[9] The intracorporate conspiracy doctrine bars this theory of liability. "The intracorporate conspiracy doctrine provides that, as a matter of law, a corporation cannot conspire with its own employees or agents." *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000) (holding that intracorporate conspiracy doctrine applies to Section 1985 claims). The doctrine reflects that "[w]hen two agents of the same legal entity make an agreement in the course of their official duties, … as a practical and legal matter their acts are attributed to their principal," and so "there has not been an agreement between two or more separate people" as is necessary to establish a conspiracy. *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). Here, Plaintiffs allege a private conspiracy among Meta Platforms, Inc., its subsidiaries (Facebook and Instagram), and its agents or employees (Zuckerberg and John Does 1-10), without even a suggestion that any of the alleged conspirators were acting outside the scope

---

[8] Although the FAC also alleges a violation of § 1986 in addition to the § 1985 claim, FAC ¶¶ 150-155, Plaintiffs' preliminary-injunction motion does not advance an argument based on their § 1986 claim. Plaintiffs could not, in any event, establish a likelihood of success on that claim either. "A claim can be stated under § 1986 only if the complaint contains a valid claim under § 1985." *McCalden v. California Libr. Ass'n*, 955 F.2d 1214, 1223 (9th Cir. 1990). Because Plaintiffs' § 1985(3) claim fails, so does their § 1986 claim.

[9] The FAC alleges two separate conspiracies: an intracorporate conspiracy exclusively composed of Defendants and a conspiracy between Defendants and the government. *See, e.g.*, FAC ¶¶ 127-128. Plaintiffs' preliminary-injunction motion, however, rests its Section 1985(3) arguments solely on the intracorporate conspiracy.

of their employment. Because "a company cannot conspire with itself," Plaintiffs cannot establish any likelihood of success on their Section 1985(3) claim on this basis. *White v. Pac. Media Grp., Inc.*, 322 F. Supp. 2d 1101, 1111 (D. Haw. 2004) (applying intracorporate conspiracy doctrine to bar Section 1985(3) claim against an employee, a company, and its parent company).[10]

   ***No Conspiratorial Objective.*** Plaintiffs' claim that Defendants are engaged in a conspiracy to prevent Facebook and Instagram users from supporting Kennedy's third-party candidacy is both implausible and unsupported. A conspiracy requires a "meeting of the minds" *to achieve the prohibited conspiratorial objective*. *O'Handley*, 62 F.4th at 1159; *accord* Mot. 17 (a conspiracy is "an agreement or 'tacit understanding' between two or more persons 'to carry out the prohibited conduct'"). As the Ninth Circuit explained in *O'Handley*, the allegations there "establish[ed] at most, a meeting of the minds to promptly address election misinformation, not a meeting of the minds to violate constitutional rights," and "[t]here is nothing wrongful about" the former goal. *Id.* Here, Plaintiffs allege a meeting of the minds to obstruct advocacy for Kennedy but provide no evidentiary support for that implausible allegation. Instead, they reason that it cannot be "pure *coincidence*" that both Facebook and Instagram are "censoring the same pro-Kennedy content that [in Plaintiffs' own view] does not violate either platforms' terms of service." Mot. 18. Drawing such a fact-free inference is inappropriate on a motion for a preliminary injunction. And, in any event, the inference is faulty. As discussed, *supra* 5-7, neither removal of the links to the *Who is Bobby Kennedy* video, nor identified content moderation actions on Reed Kraus's Instagram user account had anything to do with Kennedy-specific content. Instead, these actions resulted from standard application of Meta's policies, including those prohibiting threats of violence (as to Reed Kraus) and deceptive links (as mistakenly applied to the video, and quickly corrected). *Supra* 5-7.

---

[10] Although the Ninth Circuit has declined to decide whether the intracorporate conspiracy doctrine applies to § 1985 claims, *see Portman v. County of Santa Clara*, 995 F.2d 898, 910 (9th Cir. 1993), a majority of the circuits have applied the doctrine to such claims. *See Bowie v. Maddox*, 642 F.3d 1122, 1129 (D.C. Cir. 2011) (collecting cases). The outlying circuits have declined to apply the doctrine based on "public policy reasons" in cases "alleging conspiracies to discriminate on the basis of race or sex." *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1058 (C.D. Cal. 2000) (discussing First and Third Circuit cases). But as *Hoefer* explained in declining to follow those outlier decisions and *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323 (N.D. Cal. 1988), the application of the doctrine "should not depend on the perceived importance of the issue or public policy involved." *Hoefer*, 92 F. Supp. 2d at 1059.

Indeed, the speculation that Meta somehow conspired to harm Kennedy's candidacy is belied by the fact that Meta offers Kennedy support through its Government and Social Impact team to ensure he, like other presidential candidates, have a direct way to raise concerns and seek remediation (as happened here). *Id.* Simply put, Plaintiffs have not even plausibly alleged, let alone produced evidence to support, any conspiratorial objective to prevent users from expressing support for Kennedy or to injure users for doing so.

*Not The Kind Of "Force, Intimidation, Or Threat," Or The Kind Of "Injury," Necessary Under The KKK Act.* The standard notices Defendants send to Facebook and Instagram users regarding violations of the policies and terms alleged here are not the kind of "force, intimidation, or threat," or the kind of "injury," needed to state a claim under the Support and Advocacy Clause.

As the Eighth Circuit explained in *Gill v. Farm Bureau Life Insurance Co. of Missouri*, this statutory text must be "[v]iewed in the light of its origin as a reaction against the murders, whippings, and beatings committed by rogues in white sheets in the postbellum South." 906 F.2d 1265, 1269 (8th Cir. 1990). So viewed, "the Ku Klux Klan Act obviously meant to its framers, when it spoke of 'force, intimidation, or threat' something much more serious and terrifying than a written notice of cancellation of a contract." *Id.* In part for that reason, the court held that the plaintiff had no cause of action under the Support and Advocacy Clause even though the "sole reason" for contract cancellation was that the plaintiff "supported and was a fund-raiser for a candidate for Congress running against the incumbent … the insurance company favored." *Id.* at 1266; *see also Gaetz v. City of Riverside*, 2024 WL 1269311, at *11 (C.D. Cal. Mar. 22, 2024) (reasoning that framers of Section 1985(3) "'obviously meant … something much more serious and terrifying' than tweets and public statements" (quoting *Gill*, 906 F.2d at 1269)).

Here, far from the use or threat of physical force contemplated by Section 1985's drafters, Plaintiffs point (at 19-20) only to the routine implementation of Meta's policies and terms. But just as the mere cancellation of a contract in *Gill* was insufficient to amount to "force, intimidation, or threat" for the purposes of the Act, so too is the application of Meta's content moderation policies. Likewise, the content moderation actions alleged here cannot constitute an "injury" within the meaning of the Support or Advocacy Clause. "The victim 'injured in his person or

1    property' was surely contemplated by Congressmen in 1871 as suffering something more severe

2    than loss of" the inability to post content on a private social media service. *See Gill*, 906 F.2d at

3    1269 (loss of "commissions as an insurance agent" insufficient to establish injury under

4    § 1985(3)).[11]

5         ***AV24 And Kennedy Lack Statutory Standing.*** AV24 and Kennedy also lack statutory

6    standing to bring a § 1985(3) claim. *Contra* Mot. 20-21. The statutory standing inquiry is "whether

7    a particular plaintiff has been granted a right to sue by the statute under which he or she brings

8    suit." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1199 (9th Cir. 2004). The statute's text and

9    history evince Congress's intent to protect the rights of citizens who are able to vote by permitting

10   *those citizens* to sue for damages when their voting-related rights are violated. The "key concern"

11   of the Congress that enacted § 1985(3) "was to put force behind the Civil War Amendments by

12   providing an avenue for the redress of injuries *suffered by the class of newly emancipated slaves*."

13   *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 932 (5th Cir. 1977) (emphasis added).

14   Here, AV24 is not even a "citizen who is lawfully entitled to vote." 42 U.S.C. § 1985(3). As for

15   Kennedy, the FAC nowhere alleges that Defendants prevented *him* from expressing his support or

16   advocacy (or punished *him* for doing so) by removing or restricting his posts; throughout, Plaintiffs

17   merely allege that Reed Kraus and other non-plaintiff, third-party Instagram and Facebook users

18   were prevented from expressing support for Kennedy. Neither the text nor the history of § 1985(3)

19   suggest that Congress intended to authorize suit by individuals, campaigns, or corporations

20   incidentally impacted by the violation of *others'* voting rights.

21        **C.    Section 230 Independently Bars Plaintiffs' Statutory Claims**

22        Apart from the fatal claim-specific defects discussed above, Plaintiffs' statutory claims are

23   independently barred by the Communications Decency Act, 47 U.S.C. § 230.

24

25

26   _____

[11] Plaintiffs contend (at 19-20) that the 1871 KKK Act's reference to force, intimidation, and threat should be read to mean the same thing as the 1965 VRA's reference to intimidation, threat, and coercion. Not so. *See supra*; *Wohl*, 498 F. Supp. 3d at 477 (explaining that "[S]ection 11(b) was a deliberate attempt to expand the existing laws against voter intimidation" (quotation marks omitted)). But even if that were true, Plaintiffs' § 1985(3) claim would fail for the same reason that Plaintiffs' Section 11(b) claim fails: they cannot establish that Meta's communications and actions were objectively intimidating or threatening.

1   As the Ninth Circuit has repeatedly recognized, Congress enacted Section 230 "to

2   encourage voluntary monitoring" of objectionable material, *Carafano v. Metrosplash.com, Inc.*,

3   339 F.3d 1119, 1122 (9th Cir. 2003), by "immuniz[ing] a webhost who exercises a publisher's

4   traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter

5   content," *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009), *as amended* (Sept. 28,

6   2009). Courts thus routinely hold that Section 230(c)(1) bars the kind of claims at issue here:

7   claims that seek to impose liability for an interactive computer service provider's "decision to

8   block access to—or, in other words, to refuse to publish"—user content. *Sikhs for Justice, Inc. v.*

9   *Facebook, Inc.*, 144 F. Supp. 3d 1088, 1094-1095 (N.D. Cal. 2015), *aff'd*, 697 F. App'x 526 (9th

10  Cir. 2017) (mem.); *see also, e.g.*, *Fyk v. Facebook, Inc.*, 808 F. App'x 597, 598 (9th Cir. 2020),

11  *cert. denied*, 141 S.Ct. 1067 (2021).

12  Section 230(c)(1) states: "No provider or user of an interactive computer service shall be

13  treated as the publisher or speaker of any information provided by another information content

14  provider." The provision bars a claim when three elements are met: "(1) Defendant is a provider

15  or user of an interactive computer service; (2) the information for which Plaintiff seeks to hold

16  Defendant liable is information provided by another information content provider; and (3)

17  Plaintiffs' claim seeks to hold Defendant liable as the publisher or speaker of that information."

18  *Sikhs for Justice*, 144 F. Supp. 3d at 1092-1093; *accord Barnes*, 570 F.3d at 1100.

19  Each of these conditions is satisfied as to Plaintiffs' claims. *First*, Meta, Instagram, and

20  Facebook are "provider[s]" of "interactive computer service[s]" within the meaning of the statute.

21  *See, e.g.*, *Dangaard v. Instagram, LLC*, 2022 WL 17342198, at *4 (N.D. Cal. Nov. 30, 2022). The

22  individual defendants, including Zuckerberg, likewise qualify as "providers" of an "interactive

23  computer service." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357-58 (D.C. Cir. 2014). *Second*,

24  Plaintiffs concede that the at-issue Facebook and Instagram posts were created by third-party users.

25  *E.g.*, FAC ¶¶ 35 n.3, 47. Plaintiffs' claims thus concern content "provided by another information

26  content provider." 47 U.S.C. §230(c)(1). *Finally*, Plaintiffs' Section 11(b) and Section 1985 claims

27  seek to hold Defendants liable as the publishers of the third-party posts supporting Kennedy,

28  because those claims seek to impose liability on Defendants for deciding "to exclude material that

---

third parties s[ought] to post online." *Barnes*, 570 F.3d at 1102-1103. That these voting statutes do not explicitly refer to publishing is of no moment: to prevent plaintiffs from skirting Section 230's protection through creative pleading, courts have emphasized that "what matters is not the name of the cause of action," but rather whether the cause of action seeks to impose liability for "*publishing conduct*"—such as "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Id.* at 1101-1103. Because Plaintiffs fault Defendants for applying "content moderation policies" to allegedly "censor[]" third-party posts, FAC ¶ 180, these claims squarely target Defendants' publishing conduct and are accordingly barred by Section 230(c)(1).

Even if Section 230(c)(1) did not immunize Defendants, Section 230(c)(2) would. *Barnes*, 570 F.3d at 1105 (explaining that Section 230(c)(2) "provides an additional shield from liability" beyond that provided by Section 230(c)(1)). Section 230(c)(2)(A) shields Defendants for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider … considers to be … objectionable, whether or not such material is constitutionally protected." 47 U.S.C. § 230(c)(2)(A) (emphases added)). "[T]he provision establishes a subjective standard whereby internet users and software providers decide what online material is objectionable." *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1044 (9th Cir. 2019). Here, all of the content moderation decisions Plaintiffs point to are the result of Meta's good-faith actions to ensure the safest, most secure, and most enjoyable experience for its users. *Supra* 3-6. That some of these actions were based on a mistaken determination by Meta's automated systems that a particular post violated Meta's policies does not remove Section 230's protections. Indeed, the purpose of Section 230(c)(2)(A) was to ensure that interactive computer service providers are not disincentivized from moderating content by the threat of liability if they mistakenly remove (or fail to remove) certain content. *See Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (discussing legislative history of Section 230).

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion should be denied.

1

2

DATED: August 6, 2024                    Respectfully submitted,

3                                        WILMER CUTLER PICKERING
                                          HALE AND DORR LLP

4
                                         By: */s/ Sonal N. Mehta*
5                                        SONAL N. MEHTA
                                         ARI HOLTZBLATT
6                                        ALLISON SCHULTZ (*pro hac vice*)
                                         KYLE T. EDWARDS
7                                        NATHANIEL W. REISINGER (*pro hac vice*)

8

9                                        *Attorneys for Defendants Meta Platforms Inc.,*
                                         *Facebook Operations, LLC, Instagram LLC,*
10                                       *and Mark Zuckerberg*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

3          I hereby certify that on August 6, 2024, I caused the foregoing to be filed electronically

4   with the Clerk of Court and to be served via the Court's Electronic Filing System upon all counsel

5   of record.

6

7   **<u>By Electronic Mail</u>**

8   Richard Aaron Jaffe
    rickjaffeesquire@gmail.com

9
    Deirdre Lyman Goldfarb
10   dgoldfarblaw@gmail.com

11   Jed Rubenfeld
    rubenfeldjed@gmail.com

12

13

14   Dated: August 6, 2024                    By:    _/s/ Sonal N. Mehta_
                                                    Sonal N. Mehta
15

16

17

18

19

20

21

22

23

24

25

26

27

28